[Nos. A018431, A021496. First Dist., Div. Three. Apr. 29, 1986.]

JONNE ALDERSON, Plaintiff and Respondent, v.
STEVE COLDEN ALDERSON, Defendant and Appellant.

**COUNSEL**

Steve Colden Alderson, in pro. per., and John E. Jones for Defendant and Appellant.

Gregory F. Jilka and Allison R. Pharis for Plaintiff and Respondent.

**OPINION**

**MERRILL, J.**—Appellant Steve Alderson appeals from a March 31, 1982, judgment dividing certain real property equally between himself and respondent Jonne Alderson (A018431). He also appeals from a January 28, 1983, order appointing a receiver for his real property (A021496). The two appeals have been consolidated herein.

I

Jonne Koenig and Steve Alderson first met in December 1966 in Reno, Nevada. Jonne was living with her parents at the time and was employed at a local bank. During the ensuing year, Jonne and Steve fell in love and talked of marriage.

In September 1967, Jonne moved from Reno to Portland, Oregon, for the purpose of marrying Steve who had moved there a month earlier. The marriage plans, however, for various unspecific reasons, did not materialize.

Instead, Jonne and Steve embarked on a period of nonmarital cohabitation which lasted 12 years.

The couple initially rented a house in Portland. Steve worked as a civil engineer. Jonne found a job as a receptionist. The parties' earnings were placed in joint bank accounts. The two filed a joint federal income tax return as a married couple in 1967.

In September 1968 the couple moved to Eugene, Oregon, because of Steve's job and purchased their first home. The decision to purchase the property was made jointly. The parties intended the acquisition to be both a home and an investment. Title was taken in Steve's name only. Nevertheless, the downpayment on the property came from the parties' joint savings account and, according to Jonne's later testimony, it was her understanding that she and Steve owned the property together.

Jonne secured another office position in Eugene. And in December 1969 the couple had the first of three children that were to be born to them.

The Eugene, Oregon, move and purchase began a string of moves and realty acquisitions for the pair over the next 11 years. Between 1968 and 1979, the two acquired a total of fourteen properties, most of which were purchased purely for investment purposes. Eleven of the fourteen properties were located in California where the couple eventually settled. Purchase of the properties was again made by joint decision of the parties. Down payments for these purchases came from the couple's joint savings account and/ or loans from Jonne's parents. Jonne and Steve acquired title to seven of the properties as husband and wife or as married persons. With three of the properties, they acquired joint title without designation as to marital status.

Jonne, who continued to work off and on during this period, contributed her earnings toward these realty purchases. Additionally, she collected the rents, paid the bills and kept the books for all the rental properties. She also helped to repair and fix up the properties. She later testified that she viewed the properties as "our houses." She said: "We both worked and sacrificed different things so that we had the money to buy them and to keep them." "We had higher expectations than some because we wanted property; we wanted investments; we wanted things for the future for the kids."

During the entire 12-year period Jonne and Steve lived together, they held themselves out as a married couple to everyone including family and friends. Jonne assumed Steve's surname of Alderson as her own, as did the three children. The couple maintained joint bank accounts throughout the period and filed joint federal income tax returns.

At the end of this period, in December 1979, the parties separated. Jonne moved from the family home, she said, because Steve "told me to get out." Prior to leaving, Jonne signed quitclaim deeds "for all of the houses." She said she did so under duress. She testified that Steve made various threats of what he would do to her if she did not sign. "Steve told me that I would never get any property. He would see me dead before I got any of them." Jonne said she was afraid for her own safety and so she "just signed [the deeds] to get out." Jonne received no payment for signing the deeds.

## II

On October 14, 1980, Jonne filed her second amended complaint against Steve. The first cause of action alleged that Steve was the father of Jonne's three minor children, and sought child support and attorney fees. The second and third causes of action alleged that Jonne and Steve lived together as husband and wife for a 12-year period although they were not married. During this period the parties had three children and jointly accumulated substantial property, including 10 parcels of real property. (At trial, it was determined that the parties actually had 11 properties at the time of separation; 3 other properties had been sold prior to separation.) According to the complaint, the parties impliedly agreed to equally share the property acquired during the course of their relationship. The second cause of action also alleged that Steve had coerced Jonne into signing quitclaim deeds to the real property. The complaint sought to set aside the quitclaim deeds and to equally divide the property.

In a fourth cause of action, Jonne alleged that Steve had recently committed an assault and battery on her and had broken her arm. (The assault apparently took place sometime after the filing of the first amended complaint. Steve was later convicted of having violated Pen. Code, § 243, a misdemeanor, based on this assault.) The complaint sought compensatory and punitive damages. In the fifth cause of action, Jonne sought injunctive relief against harassment by appellant under Code of Civil Procedure section 527.6.

In his answer to the complaint filed on November 10, 1980, Steve denied paternity of two of the three children. He denied all of the other material allegations of the complaint. Steve also set forth affirmative defenses asserting that (1) Jonne had sexual intercourse with other men; (2) the alleged agreement to share property violated the statute of frauds; (3) estoppel; and (4) self-defense.

On February 13, 1981, a stipulation for entry of judgment was filed in which defendant admitted paternity of all three children. On February 18,

1982, an "Order Specifying Issues Without Substantial Controversy . . ." was filed in which the following issue was deemed established against Steve: "On or about September 7, 1980, defendant Steve Colden Alderson did willfully and unlawfully use force and violence upon the person of plaintiff, and as a result thereof did inflict serious bodily injury upon the plaintiff." This order was based upon Steve's municipal court conviction for violation of Penal Code section 243.

By stipulation it was ordered that the first, second and third causes of action (i.e., paternity, child support, and division of property) were to be tried separately from the fourth (assault and battery) and fifth (injunctive relief) causes of action.

On March 4, 1982, trial of the first, second and third causes of action commenced without jury. All of the issues concerning paternity, child support and child visitation were settled by stipulation, including an acknowledgment by Steve that he was the father of all three children. After hearing the evidence, the court, on March 31, rendered judgment for Jonne on the property issues. The court declared that Jonne was entitled to an undivided one-half interest in the parties' property, quieted title to the real property in both of the parties, and set aside the quitclaim deeds. The trial court denied Steve's request for a statement of decision as untimely under Code of Civil Procedure section 632. By stipulation, the court reserved jurisdiction to divide the property. In a stipulated order filed on May 25, 1982, the parties equally divided the property. The stipulation was made without prejudice to Steve's right to appeal from the judgment.

On June 16, 1982, Steve filed a notice of appeal from both the March 31, 1982, judgment and the stipulated order of May 25, 1982. On August 10, 1982, this court dismissed the appeal from the stipulated order of May 25, 1982.

On July 9, 1982, trial of the bifurcated fourth and fifth causes of action was held. Judgment was rendered again in favor of Jonne and included $15,000 in compensatory damages, plus $4,000 for punitive damages. This judgment is not the subject of an appeal.

### III

In her complaint, Jonne, in essence, alleges an implied contract between the parties to equally share the property acquired during the course of their relationship. In ruling in her favor, the trial court impliedly found this allegation to be true.

In this appeal, Steve does not appear to dispute the court's finding. Nevertheless, he maintains that the trial court's ruling upholding the contract must be overturned because the contract was illegal and thus unenforceable. Under *Marvin v. Marvin* (1976) 18 Cal.3d 660 [134 Cal.Rptr. 815, 557 P.2d 106], he says, "[it] is clear that a contract between two unmarried persons living together will not be enforced if an inseparable part of the consideration for the contract is an agreement to provide sexual services." Steve adds: "The record below is uncontradicted that the agreement between appellant and respondent integrally contemplated that the parties would provide sexual services to each other." We find no merit in Steve's contention.

In *Marvin,* a woman brought an action against a man with whom she had lived for approximately six years, in which she alleged that she and defendant entered into an oral agreement that during the time they lived together they would combine their efforts and earnings and share equally the property accumulated through their individual or combined efforts, and that plaintiff would render services to defendant as companion, housemaker, housekeeper and cook, give up her career as an entertainer and singer, and that defendant would provide for all her financial support for the rest of her life. Plaintiff further alleged that at the end of the six-year period, defendant compelled her to leave his household. He continued to support her for about one and one-half years, but thereafter refused to provide further support and refused to recognize that she had any interest in the considerable amount of property that had been accumulated during the years they resided together.

Plaintiff prayed for declaratory relief, asking the court to determine her contract and property rights and also to impose a constructive trust upon one-half of the property acquired during the course of the relationship. The trial court granted defendant's motion for judgment on the pleadings.

The Supreme Court reversed. The high court held that the terms of the contract as alleged by plaintiff in *Marvin* furnished a suitable basis upon which the trial court could render declaratory relief, and the trial court therefore erred in granting defendant's motion for judgment on the pleadings. The court held generally that while the provisions of the Family Law Act do not govern the distribution of property acquired during a nonmarital relationship, the courts should enforce express contracts between nonmarital partners except to the extent that the contract is explicitly founded on the consideration of meretricious sexual services. Said the court: "The fact that a man and woman live together without marriage, and engage in a sexual relationship, does not in itself invalidate agreements between them relating to their earnings, property, or expenses. Neither is such an agreement invalid merely because the parties may have contemplated the creation or continuation of a nonmarital relationship when they entered into it. *Agree-*

*ments between nonmarital partners fail only to the extent that they rest upon a consideration of meretricious sexual services."* (*Marvin v. Marvin, supra,* 18 Cal.3d at pp. 670-671, italics added.) "[A] contract between nonmarital partners, even if expressly made in contemplation of a common living arrangement, is invalid *only if sexual acts form an inseparable part of the consideration for the agreement."* (*Id.,* at p. 672, italics added.)

"In summary, we base our opinion on the principle that adults who voluntarily live together and engage in sexual relations are nonetheless as competent as any other persons to contract respecting their earnings and property rights. Of course, they cannot lawfully contract to pay for the performance of sexual services, for such a contract is, in essence, an agreement for prostitution and unlawful for that reason. But they may agree to pool their earnings and to hold all property acquired during the relationship in accord with the law governing community property; conversely they may agree that each partner's earnings and the property acquired from those earnings remains the separate property of the earning partner. *So long as the agreement does not rest upon illicit meretricious consideration, the parties may order their economic affairs as they choose, and no policy precludes the courts from enforcing such agreements."* (*Id.,* at p. 674, italics added, fn. omitted.)

Although not directly called upon to do so, the *Marvin* court further addressed the issue of the property rights of a nonmarital partner in the absence of an express contract. Rejecting what it called "judicial barriers that . . . stand in the way of a policy based upon the fulfillment of the *reasonable expectations of the parties* to a nonmarital relationship," the court held that "[c]ourts may inquire into the conduct of the parties to determine whether that conduct demonstrates an implied contract or implied agreement of partnership or joint venture [citation], or some other tacit understanding between the parties. The courts may, when appropriate, employ principles of constructive trust [citation] or resulting trust [citation]. Finally, a nonmarital partner may recover in quantum meruit for the reasonable value of household services rendered less the reasonable value of support received if he can show that he rendered services with the expectation of monetary reward. [Citation.]" (*Marvin v. Marvin, supra,* 18 Cal.3d at p. 684, italics added.)

Comparing the nonmarital situation to that of the putative spouse, the court said: "[A]lthough parties to a nonmarital relationship obviously cannot have based any expectations upon the belief that they were married, other expectations and equitable considerations remain. The parties may well expect that property will be divided in accord with the parties' own tacit understanding *and that in the absence of such understanding the courts*

*will fairly apportion property accumulated through mutual effort.* We need not treat nonmarital partners as putatively married persons in order to apply principles of implied contract, or extend equitable remedies; *we need to treat them only as we do any other unmarried persons.*" (*Id.*, at p. 682, italics added.) "There is no more reason to presume that services are contributed as a gift than to presume that funds are contributed as a gift; in any event the better approach is to presume . . . 'that the parties intend[ed] to deal fairly with each other.' [Citations.]" (*Id.*, at p. 683.)

"In summary, we believe that the prevalence of nonmarital relationships in modern society and the social acceptance of them, marks this as a time when our courts should by no means apply the doctrine of the unlawfulness of the so-called meretricious relationship to the instant case. As we have explained, the nonenforceability of agreements expressly providing for meretricious conduct rested upon the fact that such conduct, as the word suggests, pertained to and encompassed prostitution. *To equate the nonmarital relationship of today to such a subject matter is to do violence to an accepted and wholly different practice.*" (*Ibid.*, italics added.)

In the instant case, the trial court ruled in favor of Jonne and held that she was entitled to an undivided half interest in the parties' properties. In so ruling, the court impliedly found that the parties' conduct over the 12-year period they were together, evidenced an implied contract between them to share equally any and all property acquired during the course of their relationship, as alleged in the complaint. The court also impliedly found this contract to be legal and enforceable under *Marvin* and not resting on "a consideration of meretricious sexual services." ▉ Our review of these findings, necessarily begins and ends with the question of whether or not they are supported by substantial evidence. ▉ After fully examining the record before us, we have determined that they are.

Evidence that the parties impliedly agreed to share equally in their acquisitions includes the following: Jonne's testimony to this effect; the fact that the parties held themselves out socially, as well as otherwise, as husband and wife; the fact that Jonne and the couple's three children, in fact, took Steve's surname; the fact that the pair pooled their financial resources and then drew upon the same to purchase the subject properties; the fact that the decision to purchase said properties was, in most cases, made jointly; the fact of Jonne's participation in the properties other than financial (she kept the books on the properties, helped repair and fix up the properties, paid the bills and collected the rents); and finally, the fact that title to 10 of the properties was taken by Jonne and Steve jointly and in the case of seven of these purchases, was taken as husband and wife.

■ Evidence that consideration for the implied agreement between the parties did not rest on meretricious sexual services includes the absence of any evidence to the contrary and Jonne's own testimony.[1] Said testimony

---

[1] "[Defense Counsel]: Q. Mrs. Alderson, in your complaint, you described that you had a contract with Mr. Alderson by which you would share the ownership of all of the property you acquired during the time you lived together, is that a fair statement of what you are saying in the case?

"A. Yes.

"Q. According to the terms of your contract you were going to do something for the property you were to acquire, is that correct?

"A. I was going to do something?

"Q. Yes. You each were going to do things for each other, is that correct?

"A. You mean both to work and—

"Q. Yes.

"A. Uh huh.

"Q. For instance, you were going to cook for you and Mr. Alderson, is that right?

"A. I was. I was his wife. I mean, whatever a wife does.

"Q. Okay. Well, let me list the things that a wife does and ask you if that's what you understood you were going to do as part of this contract, all right. Did you understand that as part of your contract you were going to cook?

"A. I—as far as a contract, written, saying I did this and he did this, we just were living together as we were married. We did anything that any other married couple did and we pooled together resources, we saved money, we didn't buy things so we had money to buy houses.

"Q. Let me ask this: Was it your understanding that you were going to stay home and cook for the time that you lived together as long as you didn't work, and Mr. Alderson was going to go out and earn the money?

"A. There was no such understanding. If I had a job, I worked and we—it was our money. If I didn't have a job, I had children to take care of.

"Q. Let me explain what I am driving at. In every contract the parties have some understanding as to what each are going to do. If I hire someone to paint my house, my understanding is that he is going to paint the house and his understanding is that I pay him, say, a thousand dollars. And I am asking you whether you had an understanding that you were supposed to do certain things, or were expected to do certain things and if you don't do those things, then this would be an extreme disappointment by Mr. Alderson. That's what I am trying—driving at. If you had not cooked and refused to cook at all times, would your living arrangement have continued?

"A. Yes, I mean it would—if I had a broken arm and couldn't cook, I wouldn't expect him to leave me.

"Q. Would you expect him to give you half of everything—

"A. Yes, there were many things, if you took one specific thing away, there was so many other things that we both did, one wouldn't make any difference, or two or three.

"Q. All right. You told me that you had a contract with Mr. Alderson, is that correct, or did you have a contract?

"A. I don't know what you mean by contract, an agreement written on paper?

"Q. No.

"A. Verbal contract?

"Q. Yes.

"A. We were living together. We were living—I mean, we were married and anything any other married couples do, we were just the same. We had higher expectations than some because we wanted property; we wanted investments; we wanted things for the future for the kids.

"Q. Let me ask this: As far as your understanding went you were going to be getting half of everything Mr. Alderson earned, is that correct?

"A. It was ours. There was no—I mean, if I left the house there was no talk of my leaving

establishes that the implied agreement between Jonne and Steve was very general and nonspecific. The parties never bothered to actually spell out the terms of their agreement or the consideration therefor. Jonne testified that her part of the consideration was to be Steve's wife and to do "whatever a wife does." However, she also said, "if you took one specific thing away, there [were] so many other things that we both did, one wouldn't make any difference, or two or three."

Such an agreement can hardly be deemed the type disapproved in *Marvin*. A contract based on "many . . . things," no one of which is in itself crucial, is not the same as one based upon a consideration of meretricious sexual services. ■ Before a nonmarital contract is to be deemed unenforceable under *Marvin,* it must be found to explicitly rest upon a consideration of meretricious sexual services and even then the contract will fail "only to the extent" that it does so. Here, there is no evidence that the agreement between Jonne and Steve, or any part thereof, explicitly rests upon such a consideration.

Nor does the fact that the couple engaged in sexual relations and that Jonne perceived this as part of her "role" alter this conclusion. As the *Marvin* court pointed out, the fact that a man and woman live together without marriage, and engage in a sexual relationship, does not in itself invalidate agreements between them relating to their earnings, property or expenses. (*Marvin* v. *Marvin, supra,* 18 Cal.3d at pp. 670-671.) In today's society when so many couples are living together without the benefit of marriage vows, it would be illogical to deny them the ability to enter into enforceable agreements in respect to their property rights.

Appellant's reliance on *Jones* v. *Daly* (1981) 122 Cal.App.3d 500 [176 Cal.Rptr. 130], is misplaced. In *Jones,* the surviving partner to a "cohabitors agreement" between two males filed an action for declaratory relief against the executor of the deceased partner's estate. According to the complaint, the agreement had been made orally and had provided that the partners would live and cohabit together and would combine their efforts and earnings and share equally all property accumulated as the result of their efforts. Part of plaintiff's consideration for the agreement, was that he

---

as far as me getting half and him getting half, was both of ours. If something happened to him it was all mine, if something happened to me, it was all his. . . .

"Q. Let me ask about the—about the role of a wife. As you performed your duty in the house, did that include being the cook for the family, the housekeeper, the companion of Mr. Alderson, the lover of Mr. Alderson and mother of the children?

"A. Yes.

"Q. Were all of those essential parts of being a wife, as you understood them?

"A. Yes."

would "'render his services as a lover, companion, homemaker, traveling companion, housekeeper and cook.'" *(Id.,* at p. 505.)

The trial court sustained a demurrer without leave to amend and dismissed the case. The Court of Appeal affirmed. Relying on *Marvin,* the appellate court held that a contract for the pooling of property and earnings is unenforceable if it is explicitly and unseparably based on services as a paramour, and in this case the complaint showed the surviving partner's rendition of sexual services was an inseparable part of the consideration for the cohabitation agreement.

The instant case is readily distinguishable from *Jones.* As indicated above, nowhere in Jonne's complaint or in the testimony adduced at trial, was there evidence that the implied contract between the parties, either in its entirety or in part, explicitly rested upon a consideration of meretricious sexual services.

## IV

At trial, Jonne admitted signing the quitclaim deeds around the time she left Steve in December 1979. She said she signed them because Steve told her he "would see me dead before I got any of [the properties]." She said she feared for her own physical safety and so she "just signed them to get out."

Evidence that tended to corroborate her claim of duress included testimony to the effect that Steve had been violent during the time the couple lived together. Jonne testified that sometimes during an argument, Steve "would just fly off the handle and hit me or knock me down." She related one incident in which Steve allegedly shot a gun that fired over her head and into a wall. Steve himself admitted that on at least one occasion, he struck Jonne with a closed hand. Other corroborating evidence included evidence that subsequent to the filing of the underlying complaint, Steve had gone to Jonne's house and beaten her up and broken her arm. In view of this evidence, the trial court, as part of its judgment, ordered the above deeds cancelled and set aside, finding them to be "void and of no force or effect."

Steve's contention on appeal is that the trial court's action in this regard must be overturned because there is insufficient evidence of duress. Additionally, he claims error on the part of the trial court in admitting evidence of the criminal assault over objection on grounds of irrelevancy. Appellant's assertions must fail.

The fallacy of appellant's first assertion, as to the sufficiency of the evidence, is self-evident. As demonstrated above, there is more than ample evidence to support the trial court's implied finding of duress. ██ "In reviewing the evidence on . . . appeal all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court." (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) "And the rule is identical where the trial is by the court . . . ." (9 Witkin, Cal. Procedure (3d. ed. 1985) Appeal, § 278, p. 289.) ██ In the instant case, evidence of Steve's threat of violence against Jonne if she did not sign the quitclaim deeds coupled with evidence of actual incidents of violence between the couple, both prior and subsequent to the signing, provides sufficient evidence to support the trial court's implied finding of duress.

██ Appellant's other assertion regarding the inadmissibility of the evidence of the assault, is also fatally flawed. Said evidence was relevant to establish the validity of Jonne's fear for her own personal safety and Steve's intent to carry out his threats against her. Under Evidence Code section 1101, subdivision (b), evidence of specific instances of . . . conduct is admissible to prove some fact "such as motive, opportunity, *intent*, preparation, plan, knowledge, identity, or absence of mistake or accident." (Italics added.)

## V

██ Subsequent to introducing evidence of the December 1979 quitclaim deeds at trial, appellant introduced evidence of another deed as well which antedated the December deeds by over a year. This deed, dated May 23, 1978, and allegedly signed by Jonne, also purportedly relinquished all of her interest in the subject properties.

Upon being confronted with this evidence, Jonne testified that she had not seen the document before and had not signed it. In contradiction to this, Steve testified that he had seen Jonne sign the deed. In finding in favor of Jonne, the trial court impliedly found Jonne's testimony more credible than Steve's and the May 1978 deed invalid.

Appellant maintains that the trial court's finding is, as a matter of law, erroneous since Jonne failed to produce any evidence of fraud or duress

relative to the drafting of this deed. We find this argument unpersuasive as well.

■ Appellant had the burden of establishing the authenticity and validity of this document at trial by a preponderance of the evidence, and this he failed to do. (Evid. Code, §§ 115, 500.) ■ Outside of the deed itself, the only evidence presented by appellant on this issue was Steve's testimony that he saw Jonne sign the document. This statement directly contradicted Jonne's own testimony that she had not signed, nor even seen the subject deed.

■ The trier of fact is the sole judge of the credibility and weight of the evidence and the finding of the trier of fact in this regard will not be disturbed so long as it is supported by substantial evidence. (*Estate of Teel* (1944) 25 Cal.2d 520, 526-527 [154 P.2d 384].) ■ In view of the dearth of evidence presented by Steve as to the May 1978 deed, Jonne's testimony alone was sufficient for this purpose. Other evidence supporting the trial court's finding includes the informality of the deed itself. The deed which purports to divest Jonne of numerous parcels of real estate having a value of over a quarter million dollars, consists only of one handwritten sentence.[2] It does not itemize or describe the property to which it refers. It does not contain the signatures of any witnesses. It does not evidence a recording by the county. This is in direct contrast to the 1979 deeds and, as respondent notes in her brief, hardly inspires confidence in its authenticity.

Further evidence, or lack thereof, tending to support the trial court's finding here includes: the lack of evidence of any consideration for the deed; and evidence that all subsequent deeds were drafted under duress, as set forth above.

## VI

The March 31, 1982, judgment awarded Jonne custody of the parties' three children and child support payments in the amount of $165 monthly per child (totaling $495 monthly). Child support payments were apparently secured by way of an assignment on Steve's wages. However, said payments came to a halt in October 1982 after Steve quit his job. On October 8, 1982, Jonne moved the court for the appointment of a receiver for Steve's real property for the purpose of insuring future child support payments. The

---

[2]The document stated simply: "To Whom It May Concern: [¶] I hereby declare that I have no interest and also release any ownership in the property held in joint tenancy by me and Steve C. Alderson."

motion came on for a hearing on October 29, 1982. At that hearing, it was determined that Steve had left his job voluntarily. The matter, however, was continued to January 28, 1983, to allow Steve the opportunity to demonstrate good faith. At the January hearing, finding that Steve had failed to make any support payments in the interim, the court granted Jonne's motion and issued an order appointing a receiver for the subject properties. Steve appeals from this order appointing a receiver.

Steve contends that the trial court abused its discretion in granting this motion. The abuse, he says, stems from the fact that there was no showing that he was "secreting or wasting his assets"; Jonne was "wealthy" in her own right and could adequately provide for the children; and Jonne had failed to seek alternative remedies prior to filing the motion. We reject these assertions.

██ "'The rule is established that the appointment of a receiver rests largely in the discretion of the trial court and that its action in appointing a receiver or its refusal of an application for the appointment of such an officer will not be disturbed in the absence of a showing that the court's discretion has been abused.'" (*Elson* v. *Nyhan* (1941) 45 Cal.App.2d 1, 4-5 [113 P.2d 474].)

██ Having reviewed the record in the instant case, we find no abuse of discretion on the part of the trial court in the appointment of a receiver. Civil Code section 4380 empowers the court to resort to such action when "necessary" to enforce a judgment. Here, the record amply supports the trial court's determination that the appointment was necessary for this purpose.

The record reflects an ongoing attempt by Steve to thwart the judicial process in this case. The more serious examples are his coercion of Jonne to sign the quitclaim deeds and his criminal assault of her following the filing of the instant complaint. Steve's resignation of his job appears to be one more contemptuous act on his part. Steve admits voluntarily leaving his job without first securing another position and without any plans as to how he would support his children. He admits thereafter refusing to cooperate with Jonne's counsel by failing to provide information as to any other prospective income he might have. At the January 28 hearing, Steve told the court that he had placed two of his properties on the market to generate additional income but had refused to identify these properties to Jonne's counsel because, he said, "[i]t is none of his business . . . ." At the time of the January hearing, Steve was $1,780 in arrears in child support payments, having failed to make any payments whatsoever for three months.

Under these circumstances, it is clear that the trial court acted reasonably in appointing a receiver to secure said payments in the future.

██ Nor do Steve's points regarding Jonne's own wealth or her alleged failure to seek alternative remedies, deter from this conclusion. Jonne's financial standing was presumably already considered in the setting of the original child support award. Additionally, the record indicates that at the time Steve stopped making child support payments, Jonne herself was unable to work as she was recovering from surgery.

And Jonne did seek alternative remedies to the receivership. Through counsel, she sought to secure support payments through a wage assignment, a remedy which was effectively thwarted by Steve in quitting his job. Additionally, she filed contempt proceedings against Steve[3] and even suggested to Steve that they seek a continuance on the receivership matter to coincide with the later scheduled contempt hearing. However, appellant declined this suggestion and shouldn't be heard now to complain.

## VII

██ As a final issue, respondent Jonne claims that the appeals herein are frivolous and that she should thus be awarded damages (including attorney fees and costs) pursuant to Code of Civil Procedure section 907 and California Rules of Court, rule 26(a). We decline to do so.

Although we have noted Steve's lack of cooperation with the judicial process, we cannot say that as a matter of law the subject appeals are frivolous. The standards for testing the legality of agreements between unmarried couples are still evolving in the courts. Appellant may have reasonably believed that his appeals had merit.

The March 31, 1982, judgment dividing the subject properties equally between the parties and the January 28, 1983, order appointing a receiver are accordingly affirmed.

White, P. J., and Barry-Deal, J., concurred.

A petition for a rehearing was denied May 29, 1986, and on May 22, 1986, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied July 16, 1986.

---

[3]As a result of these proceedings, appellant was found in contempt.