[No. A090260. First Dist., Div. Two. Feb. 5, 2001.]

CELESTE DELLA ZOPPA, Plaintiff and Appellant, v.
JOSEPH DELLA ZOPPA, Defendant and Respondent.

**COUNSEL**

Law Offices of Brian D. Thiessen, Brian D. Thiessen; Filice Law Offices and Gerald W. Filice for Plaintiff and Appellant.

Fershko, Lewis & Blevans, Robert E. Blevans and James R. Rose for Defendant and Respondent.

**OPINION**

**HAERLE, J.—**

## I. INTRODUCTION

This is an appeal from a summary judgment entered below in favor of the defendant and respondent in a *Marvin*-type of action.[1] The trial court held that the *Marvin* doctrine did not apply because, notwithstanding the fact that the parties cohabited and, indeed, later married, the alleged agreement regarding respondent's property also anticipated appellant "bearing a child." The court concluded that the agreement thus necessarily involved sexual intercourse and was therefore unenforceable because "dependent upon a meretricious consideration." We reverse.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Joseph Della Zoppa (hereafter Joseph)[2] was a relatively wealthy 48-year-old man who, in 1988, was engaged in the garbage business in Solano and Contra Costa Counties. In that year, he met Celeste Concannon (later Celeste

---

[1]See *Marvin v. Marvin* (1976) 18 Cal.3d 660 [134 Cal.Rptr. 815, 557 P.2d 106] (*Marvin*).

[2]For the sake of clarity, we will use the parties' first names throughout. No disrespect is intended.

Della Zoppa, hereafter Celeste) who, at that time, was 22 years old. Both were single at the time; Joseph had been married twice before, but both marriages had ended in divorce and neither had produced any children.

Starting, apparently, in the fall of 1988, the couple began dating regularly. Among other things, they occasionally traveled together and, according to Celeste, they "spent time together overnight a lot at his place . . . ." During this year, Joseph importuned Celeste to move in with him permanently. She initially resisted, asserting that she "did not want to move in unless we were going to have a long range permanent husband and wife type of relationship." However, in October or November 1989, she did in fact move into Joseph's home and, in her words, the two "started living together by mutual agreement as Husband and Wife."

This included, Celeste set forth to the trial court, "spending almost all of our time with each other, acquiring things together, entertaining, getting rid of things together, having the freedom to make decisions for the both of us, making plans for traveling together, discussing (and to the extent we could do so, implementing) hopes and dreams and fears and future plans, making joint decisions on a host of different things, etc. [¶] . . . Instead of just being a couple who dated, did not concentrate on the strengthening of each other, and had separate lives, we merged our lives, our activities, our plans, our hopes, our dreams, our work, our energies for the joint benefit of each of us and, more importantly, for our future together. [¶] We agreed that we were thereafter building our future together—personal, family, social contacts, community activities, our joint assets, debts and everything else was thereafter being done as husband and wife—not for Joe, not for Celeste, but for our joint benefit."

Included in Celeste's agreed-upon responsibilities were such matters as preparing meals, managing the home generally, arranging for remodeling, including arranging for new carpeting, furniture, artwork and appliances in, and painting of, the home. Joseph, in addition to his employment, generally managed the investments of the couple.

Celeste alleged that, in consideration of her moving in and commencing "living together . . . as Husband and Wife," it was agreed between them, and understood, that "all property acquired [with either party's skills, efforts, labor or earnings] were to be treated as their joint property." She added, in answers to interrogatories: "As mentioned above, Joe and I in everything we did merged our skills, efforts, labor and earnings as our joint property. There was no reason for Joe to transfer title of any properties to my name as I trusted him completely to do what he said, that is to manage and control the

assets we had for our joint benefit. It did not matter to Joe or to me in whose name an asset was held, we were committing our entire beings, our fiber, our energies, our assets, our time, our talents, to build our future together. [¶] . . . [¶] . . . We just did what we had said we would do and built a life together and this included the assets that were being acquired during that period, primarily by and through Joe's actions."

An integral part of the basic agreement, Celeste acknowledged in the trial court, was a commitment to try to "have a family." "Joe wanted me to get pregnant and have his children, to stop using birth control." And, indeed, they did: Celeste became pregnant in, apparently, late 1990; their first child, Joseph, Jr., was born in August 1991. During her pregnancy, she started using the surname Della Zoppa at certain times. The parties married in April 1992 and two more children, twin girls, were born to them in November 1996. Celeste apparently filed a dissolution action in January 1998 and, in the course of that action, Joseph asserted various separate property claims. As a result, Celeste filed this *Marvin*-style complaint in September 1998.

The complaint alleged causes of action for, among other things, a constructive trust and a resulting trust covering all of Joseph's assets and an adjudication that Celeste held equitable title to an undivided 50 percent ownership interest in all of the real and personal property accumulated by the couple.

Joseph filed a general demurrer and a motion to strike certain portions of the complaint. He argued, in support of both, that the parties' subsequent marriage vitiated any *Marvin*-type claim, and that any and all property accumulated during the marriage was subject to distribution under, and only under, the Family Law Act. The trial court denied Joseph's general demurrer, but granted his motion to strike. As a result, this action became limited to income and properties owned and received before the parties' marriage.

In November 1999, Joseph filed a motion for summary judgment arguing that, since the alleged *Marvin* agreement included the bearing of children, it was based upon an illicit, meretricious, sexual relationship, rendering the consideration unlawful under Civil Code section 1667.

Celeste, naturally, opposed the motion and also moved for leave to amend her complaint. The trial court denied the latter motion and granted Joseph's motion for summary judgment. It held: "The agreement between the parties to share ownership of property in exchange for bearing a child is an unenforceable contract. It is dependent upon meretricious consideration, as it is based upon sexual conduct. [¶] In the alternative, if it is based upon a

promise to bear children, it is an unenforceable promise. [Citation.] As stated in *Marvin*[*, supra,*] 18 Cal.3d 660, a contract between nonmarital partners is invalid only if sexual acts form an inseparable part of the consideration for this agreement. The undisputed evidence in this case shows that sexual conduct does indeed form an inseparable part of the consideration for the agreement."

The trial court thereafter entered judgment in favor of Joseph and, later, denied motions for reconsideration and for a new trial. A timely notice of appeal followed.

## III. DISCUSSION

██ "Summary judgment is proper when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. [Citation.]" (*Barkley v. City of Blue Lake* (1996) 47 Cal.App.4th 309, 313 [54 Cal.Rptr.2d 679].) "Since a summary judgment motion raises only questions of law regarding the construction and effect of the supporting and opposing papers, we independently review them on appeal, applying the same three-step analysis required of the trial court." (*AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064 [225 Cal.Rptr. 203].) We must identify the issues framed by the pleadings, determine whether the moving party has negated the opponent's claims, and determine whether the opposition has demonstrated the existence of a triable, material factual issue. (*Id.* at pp. 1064-1065.) "On appeal our review is limited to the facts shown in the documents presented to the trial judge in making our independent determination of their construction and effect as a matter of law." (*Bonus-Bilt, Inc. v. United Grocers, Ltd.* (1982) 136 Cal.App.3d 429, 442 [186 Cal.Rptr. 357].)

██ As noted above, the trial court granted summary judgment on two closely related bases. First, it ruled that the alleged agreement between Joseph and Celeste was "an unenforceable contract" because it was dependent upon "meretricious consideration, as it is based upon sexual conduct." Alternatively, the court said, if the consideration was "a promise to bear children, it is an unenforceable promise" because "sexual conduct does indeed form an inseparable part of the consideration for the agreement." In addition to *Marvin*, the court cited in support of this conclusion *Hill v. Estate of Westbrook* (1950) 95 Cal.App.2d 599 [213 P.2d 727] (*Hill*) and excerpts from the deposition of Celeste that were filed in support of Joseph's motion for summary judgment.

We profoundly disagree with the trial court's conclusion.

■ The starting point is, of course, our Supreme Court's landmark holding in *Marvin* which, as almost all knowledgeable Californians know, held that "nonmarital partners" may enter into an enforceable agreement to share property. It stated: "[W]e base our opinion on the principle that adults who voluntarily live together and engage in sexual relations are nonetheless as competent as any other persons to contract respecting their earnings and property rights. . . . So long as the agreement does not rest upon illicit meretricious consideration, the parties may order their economic affairs as they choose . . . ." (*Marvin, supra,* 18 Cal.3d at p. 674.)

A key premise of the *Marvin* holding was the fact that the parties were cohabiting. Indeed, the most recent California authority to interpret and apply *Marvin* has commented: "Since *Marvin,* case law has held recovery by an unmarried partner under *Marvin* requires a showing of a stable and significant relationship arising out of cohabitation." (*Bergen v. Wood* (1993) 14 Cal.App.4th 854, 857 [18 Cal.Rptr.2d 75]; to the same effect, see *Taylor v. Fields* (1986) 178 Cal.App.3d 653, 663 [224 Cal.Rptr. 186] [cohabitation is a "prerequisite"] and *Alderson v. Alderson* (1986) 180 Cal.App.3d 450, 456, 461 [225 Cal.Rptr. 610] (*Alderson*) [trial court's finding of an enforceable *Marvin*-type of relationship affirmed where the parties cohabited for 12 years and "held themselves out socially, as well as otherwise, as husband and wife. . . ."].) Clearly, the parties here satisfied this paramount requirement.

But, as noted in the foregoing passage from that opinion, the *Marvin* court repeatedly noted that an exception may arise as and when the arrangement is expressly "meretricious." Indeed, this somewhat arcane term is used multiple times in the course of the majority opinion in that case. Fortunately, the court also suggested rather plainly what the term meant. Discussing the little prior California authority on the nonmarital partner issue, the court said: "[T]he nonenforceability of agreements expressly providing for meretricious conduct rested upon the fact that such conduct, *as the word suggests, pertained to and encompassed prostitution.*" (*Marvin, supra,* 18 Cal.3d at p. 683, italics added.)

Various dictionaries confirm that the term "meretricious" does, indeed, refer to prostitution. Webster's Third New International Dictionary (1965) at page 1413 defines it as "of or relating to a prostitute; having a harlot's traits." Webster's Seventh New Collegiate Dictionary (1970) at page 530 defines it as "of or relating to a prostitute." The American Heritage Dictionary (2d college ed. 1982) at page 787 defines it as meaning "[p]ertaining to or resembling a prostitute."

Several post-*Marvin* cases have confirmed that, in this state, the term relates to prostitution. Thus, in *Taylor v. Fields, supra,* 178 Cal.App.3d 653,

the court followed its use of the word with a footnote referencing this definition provided in Webster's New International Dictionary (2d ed. 1942) at page 1539: " 'Of, pert[aining] to, characteristic of, or being, a prostitute; having to do with harlots; . . . .' " (*Taylor v. Fields, supra,* at p. 658, fn. 2; see also, to the same effect, *Whorton v. Dillingham* (1988) 202 Cal.App.3d. 447, 451 [248 Cal.Rptr. 405] (*Whorton*).)[3]

In attempting to tie the facts of the case before it to the "meretricious" exception articulated in *Marvin,* the trial court cited *Hill, supra,* 95 Cal.App.2d 599. In that pre-*Marvin* case, the appellate court reversed a lower court judgment granting relief to a woman who first worked as a servant for a man, and later lived with him as man and wife and, indeed, bore him two children. (*Id.* at p. 602.) But *Marvin* itself carefully distinguished *Hill* and effectively refused to follow it. In its opinion in *Marvin,* the court first characterized *Hill* as a decision involving "contracts between nonmarital partners involv[ing] consideration that *was* expressly founded upon illicit sexual services." (*Marvin, supra,* 18 Cal.3d at p. 671.) It then went on to say that *Hill* and a similar case "demonstrate that a contract between nonmarital partners, even if expressly made in contemplation of a common living arrangement, is invalid only if sexual acts form an inseparable part of the consideration for the agreement. In sum, a court will not enforce a contract for the pooling of property and earnings if it is explicitly and inseparably based upon services as a paramour. The Court of Appeal opinion in *Hill,* however, indicates that even if sexual services are part of the contractual consideration, any *severable* portion of the contract supported by independent consideration will still be enforced." (*Id.* at p. 672.)

Indeed, later in its opinion, the *Marvin* court made clear that its philosophy was quite different from that of the appellate court in *Hill.* Thus, in the sentence immediately following its semidefinition of "meretricious," it said: "To equate the nonmarital relationship of today to such a subject matter is to do violence to an accepted and wholly different practice." (*Marvin, supra,* 18 Cal.3d at p. 683.)

To precisely the same effect is a decision from this appellate district which neither party cites, *Alderson, supra,* 180 Cal.App.3d 450. In that case,

---

[3]Interestingly, other states have recognized a far broader definition of the word "meretricious" and have held that it covers couples cohabiting without the benefit of matrimony. (See, e.g., *Milburn v. Milburn* (Ind.Ct.App. 1998) 694 N.E.2d 738, 740; *Connell v. Francisco* (1995) 127 Wash.2d 339 [898 P.2d 831, 834, 69 A.L.R.5th 705]; *In re Sutton and Widner* (1997) 85 Wash.App. 487 [933 P.2d 1069, 1071].) But, as noted both in the passage quoted earlier from *Marvin* and from the authority cited in this paragraph, that is not the definition recognized in this state.

Division Three of this district, through the late Justice Merrill, affirmed a judgment which had divided equally the property of a nonmarital couple who had cohabited for 12 years, had three children, and had acquired substantial investment property. Relying on and quoting substantially from *Marvin*, the appellate court affirmed this judgment. It first noted that there was clearly substantial evidence in the record to sustain the trial court's finding of a *Marvin*-type agreement, including "Jonne's [the plaintiff woman's] testimony to this effect; the fact that the parties held themselves out socially, as well as otherwise, as husband and wife; the fact that Jonne and the couple's three children, in fact, took Steve's surname; the fact that the pair pooled their financial resources and then drew upon the same to purchase the subject properties; the fact that the decision to purchase said properties was, in most cases, made jointly; the fact of Jonne's participation in the properties other than financial (she kept the books on the properties, helped repair and fix up the properties, paid the bills and collected the rents) . . . ." (*Id.* at p. 461.)[4]

The defendant obviously argued to the appellate court, as Joseph does here, that there was a significant "meretricious" component to the relationship, which entitled him to reversal. The court flatly disagreed: "Evidence that consideration for the implied agreement between the parties did not rest on meretricious sexual services includes the absence of any evidence to the contrary and Jonne's own testimony. Said testimony establishes that the implied agreement between Jonne and Steve was very general and nonspecific. The parties never bothered to actually spell out the terms of their agreement or the consideration therefor. Jonne testified that her part of the consideration was to be Steve's wife and to do 'whatever a wife does.' However, she also said, 'if you took one specific thing away, there [were] so many other things that we both did, one wouldn't make any difference, or two or three.' [¶] Such an agreement can hardly be deemed the type disapproved in *Marvin*. A contract based on 'many . . . things,' no one of which is in itself crucial, is not the same as one based upon a consideration of meretricious sexual services. Before a nonmarital contract is to be deemed unenforceable under *Marvin*, it must be found to explicitly rest upon a consideration of meretricious sexual services and even then the contract will fail 'only to the extent' that it does so. Here, there is no evidence that the agreement between Jonne and Steve, or any part thereof, explicitly rests upon such a consideration. [¶] Nor does the fact that the couple engaged in sexual relations and that Jonne perceived this as part of her 'role' alter this

---

[4]A recent appellate decision cited to this precise page of *Alderson* in the course of listing the elements a finder of fact can and should consider in determining the existence of an implied agreement to share property. (See *Maglica v. Maglica* (1998) 66 Cal.App.4th 442, 456 [78 Cal.Rptr.2d 101].)

conclusion. As the *Marvin* court pointed out, the fact that a man and woman live together without marriage, and engage in a sexual relationship, does not in itself invalidate agreements between them relating to their earnings, property or expenses. [Citation.] *In today's society when so many couples are living together without the benefit of marriage vows, it would be illogical to deny them the ability to enter into enforceable agreements in respect to their property rights.*" (*Alderson, supra,* 180 Cal.App.3d at pp. 462-463, italics added, fn. omitted.)

Essentially this same point was reiterated two years later by one of our sister courts in *Whorton, supra,* 202 Cal.App.3d 447, a case involving a terminated same-sex relationship litigated under the *Marvin* doctrine. Again the appellate court held, citing to *Marvin,* that the fact that there is a sexual component of the overall relationship does not vitiate application of *Marvin* if the arrangement is not meretricious: "Adults who voluntarily live together and engage in sexual relations are competent to contract respecting their earnings and property rights. Such contracts will be enforced 'unless expressly and inseparably based upon an illicit consideration of sexual services . . . .' [Citation.] One cannot lawfully contract to pay for the performance of sexual services since such an agreement is in essence a bargain for prostitution. [Citation.] [¶] A standard which inquires whether an agreement involves or contemplates a sexual relationship is vague and unworkable because virtually all agreements between nonmarital (and certainly, marital) cohabitors involve or contemplate a mutual sexual relationship. Further, a compact is not totally invalid merely because the parties may have contemplated creating or continuing a sexual relationship, but is invalid only to the extent it rests upon a consideration of sexual services. [Citation.]" (*Whorton,* at p. 451.)[5]

Resisting this reasoning, Joseph argues that the relationship between the parties in this case was meretricious because, "under the alleged agreement, [Joseph] agreed to provide [Celeste] with an ownership interest in assets and to share income <u>in exchange for</u> Celeste's agreement to become pregnant and bear his children. It is undisputed that the agreement to become pregnant was <u>an essential term</u> of the contract; that her rights to share in the property, income, and accumulations <u>was dependent upon</u> her agreement to become pregnant and to bear children; that agreement <u>contemplated</u> the rendition of sexual services; and, of particular importance, the alleged

---

[5]Immediately after this statement, the *Whorton* court cited to *Alderson* and (correctly, in our view) summarized the holding in the latter case in words that seem directly applicable here: "[E]ven though couple engaged in sexual relations and plaintiff perceived this as part of her 'role,' no evidence that implied agreement between the parties explicitly rested upon a consideration of meretricious sexual services." (*Whorton, supra,* 202 Cal.App.3d at p. 452.)

agreement <u>did not separate the consideration</u> due to [Celeste] for her agreement to become pregnant and bear [Joseph's] children from any other consideration." (Underscoring in original.)

In support of this argument, Joseph relies principally on *Hill* and, secondarily, on Civil Code section 1667. That section, which commences title IV of the Civil Code (entitled "Unlawful Contracts") provides: "That is not lawful which is: [¶] 1. Contrary to an express provision of law; [¶] . . . or [¶] 3. Otherwise contrary to good morals." Joseph argues that the agreement violates both subsections. He seems to suggest that the holding of our Supreme Court in *Marvin* is tantamount to "an express provision of law" and that the arrangement between the parties involved here was "contrary to good morals."

We categorically reject both contentions. The phrase "express provision of law" clearly refers to a statute and, in response to the "contrary to good morals" assertion, we can only refer Joseph and his counsel again to the words of Justice Merrill: "In today's society when so many couples are living together without the benefit of marriage vows, it would be illogical to deny them the ability to enter into enforceable agreements in respect to their property rights." (*Alderson, supra,* 180 Cal.App.3d at p. 463; see also *Marvin, supra,* 18 Cal.3d at p. 683.) If this point had validity in 1986, as we think it clearly did, it is even more valid today.

Celeste's deposition testimony, which the trial court cited and which Joseph's counsel references in their brief to this court, makes no reference to "sexual services." In the portion of that testimony provided to the trial court, there is only one reference to "sexual intercourse" (and that by Joseph's counsel in his question) and two references by Celeste to the fact that the couple had sex. Celeste's testimony was uniformly to the effect that, starting in 1989, Joseph wanted her to "get pregnant and move in and start a family with him" and that, ultimately, she agreed "[t]hat I would do everything possible to conceive children." To that end, she testified, she stopped using birth control so that she could "conceive his child." But, she was clear, this was only one aspect of their relationship; the overall relationship, she stressed repeatedly, was one of mutual commitment: "It became more unspoken as our lives intertwined more and more—the time we spent together—there wasn't anything that I wasn't gonna do for him, and there was nothing that Joe wasn't gonna do for me. [¶] . . . [¶] . . . I was committed to Joe for Joe. . . ."

The record in this case does not come close to establishing a meretricious relationship, either in whole or in part.

## IV. DISPOSITION

The judgment is reversed and the case remanded to the trial court for further proceedings not inconsistent with this opinion. Costs on appeal are awarded to appellant.

Kline, P. J., and Lambden, J., concurred.