[No. A055696. First Dist., Div. Two. June 16, 1993.]

CITY AND COUNTY OF SAN FRANCISCO, Plaintiff and Respondent,
v.
GERTRUDE C. DALEY, Defendant and Appellant.

## Counsel

Du Charme & Cohen and Matthew J. Cohen for Defendant and Appellant.

Louis H. Renne, City Attorney, and Suzanne A. Tollefson, Deputy City Attorney, for Plaintiff and Respondent.

## Opinion

**BENSON, J.**—Gertrude C. Daley (Gertrude) appeals from an order appointing a receiver to bring property she owns into compliance with the San Francisco Municipal Code.[1] She contends the trial court lacked the authority to appoint a receiver, abused its discretion by appointing a receiver, and denied her a fair hearing prior to the appointment. We affirm.

[1]Because several of Gertrude's children played significant roles in these proceedings, we will refer to each of the Daleys by his or her first name for the sake of clarity.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The proceedings which ultimately led to the appointment of a receiver in this case were lengthy. In order to evaluate Gertrude's claims on appeal, particularly her claim the trial court abused its discretion by appointing a receiver, we must recount the facts leading up to the appointment in detail.

On August 29, 1988, plaintiff City and County of San Francisco (the City) commenced this action against Gertrude, her daughter Carolyn Daley (Carolyn), and Does 1 through 50. The City's complaint charges them with maintaining their single-family residence in a manner constituting a public nuisance. The residence is located at 45 Cerritos Avenue in the Ingleside Terraces neighborhood of San Francisco.[2] The following nine conditions, set forth in exhibit B to the complaint, are alleged to constitute the public nuisance: (1) downspouts not connected to drainage system; (2) accumulation of debris both inside and outside house; (3) broken rear windows and front windows covered with plywood; (4) missing handrail on house stairs; (5) no landing or steps at basement door and garage door damaged and cannot be closed; (6) deteriorated, unsafe, and hazardous rear stairs; (7) lack of a furnace or heater, water heater, bathroom, and kitchen; (8) improperly installed plumbing system; and (9) main electrical service in a hazardous condition. Each of these conditions is also alleged to violate provisions of the San Francisco Municipal Code. Exhibit B notes "[t]he violations listed herein are those that were observed, and do not include violations which may be concealed and which become evident when work is begun."

On October 3, 1988, Gertrude's son, Ron Daley (Ron), answered the complaint as "Defendant Doe 47" and denied the Property was being maintained in a manner constituting a public nuisance. Ron's answer did not identify the nature of his interest in the Property. Neither Gertrude nor Carolyn answered the complaint. When they failed to answer, the City filed a request for entry of default, which the clerk entered as requested.

On November 22, 1988, the trial court held a hearing on the City's request for injunctive relief. Neither Gertrude nor Carolyn appeared at this hearing. Ron did appear, presenting the City's attorney with "a Xeroxed piece of paper purporting to indicate his unrecorded interest in ownership" in the Property. At the conclusion of the hearing, the court entered judgment in favor of the City, finding the Property to be a public nuisance and ordering Gertrude and Carolyn to remedy the violations listed in the complaint. The judgment gave them 30 days to apply "for any and all building permits required by law to perform all work necessary to cause said premises, and all

---

[2]Henceforth, we will refer to this residence as "the Property."

parts thereof, to conform to law" or "for a permit to demolish the structure at said premises."

Following the judgment in the City's favor, a group of 12 neighboring property owners won a $58,744.16 judgment against Ron in a separate private nuisance action. This judgment included punitive damages. The court in the private nuisance action found "Ron Daley is the party responsible for this nuisance. Mr. Daley at all times has held an equitable ownership interest in the property and is admittedly the person who has controlled the use and condition of the property."

On April 23, 1991, at the City's request, the trial court directed Gertrude, Carolyn, and Ron to appear and show cause why they should not be held in contempt for failing to comply with the terms of the public nuisance judgment. According to the City's attorney, all three Daleys were named in the order to show cause "because of past problems in determining ownership. At one time Gertrude and Carolyn owned the property together. Then Carolyn transferred her interest to Ron Daley in February of 1989. Mr. Daley transferred his interest back to Gertrude Daley back in July of 1990."

Only Ron appeared at the June 12, 1991, hearing on the order to show cause, although he stated he was appearing on behalf of Gertrude as well pursuant to a recorded power of attorney. When the commissioner expressed her concern that this power of attorney was set to expire on August 21, 1991, Ron assured the commissioner that it would be extended. The commissioner also expressed her concern that Ron was denying inspectors for the City access to the Property while simultaneously representing Gertrude under a power of attorney.[3] After the commissioner ascertained that Carolyn held no current interest in the Property, the City stipulated to her dismissal from the action. The actual hearing on the order to show cause was continued when Ron declined to stipulate to have the matter heard by a commissioner.

On June 19, 1991, the date set for the continued hearing on the order to show cause, Ron once again appeared without Gertrude. The trial court expressed its inclination to jail Ron for contempt but continued the hearing to enable him to retain an attorney.

---

[3]Ron's power of attorney to act on behalf of Gertrude was recorded on August 27, 1990. Nonetheless, on May 30, 1991, Ron refused to permit Rafael Torres-Gil (Torres-Gil), a senior building inspector for the City, access to the Property on the grounds Ron did not own the Property and, thus, could not grant entry. Torres-Gil then called Gertrude to request an inspection. According to Torres-Gil, Gertrude told him "her son, Ron, had the keys and to call again . . . to set up an appointment for entry." When Torres-Gil called again, Gertrude refused his request for an inspection. Ron and Gertrude also failed to respond to a June 5, 1991, letter from the City's attorney requesting an inspection of the Property prior to the June 12, 1991, hearing.

On June 27, 1991, the date of the next hearing, Ron appeared without Gertrude and without counsel. At the outset of this hearing, Ron attempted to exercise a peremptory challenge against the trial judge, which the court denied as untimely. The City then called its inspector, Torres-Gil, as a witness. Torres-Gil testified he believed the majority of the conditions set forth in exhibit B to the complaint still existed but admitted he was not sure because Ron and Gertrude had refused him access to the Property. (See *ante*, fn. 3.) Thereupon, the trial court continued the hearing for another month, ordering Ron to provide the inspector with access to the Property. Torres-Gil then wrote Ron and Gertrude a letter suggesting three possible dates for the inspection; they never responded to his letter. Instead, near the end of the month-long continuance, Ron called the City's attorney and "indicated that he would not allow an inspection of the Property, because he felt it was 'not necessary.' [She] reminded him that he was under court order. He still refused to provide for inspection and indicated he would take up the matter with [the trial court] on July 30."

On July 30, 1991, Ron appeared for the continued hearing on the order to show cause. The City's attorney advised the trial court that Ron had refused to provide access to the Property as previously ordered by the court. The court again ordered Ron to make the Property available for inspection, setting an inspection for August 13, 1991, at 2 p.m., and continuing the hearing on the order to show cause to August 22, 1991. The court again advised Ron to consult with an attorney.

On August 12, 1991, the day before the scheduled inspection, Ron filed a document entitled "Motion to Set Aside Denial of Defendant's Motion for Peremptory Challenge." He noticed the motion for hearing in the department of the presiding judge, not the department of the judge hearing the pending order to show cause. The same day, Ron personally delivered a copy of the motion to the City's attorney and advised her he would not permit the inspection set for the next day. She "reminded him that he was under court order to provide the inspection and he insisted that the inspection was not going to happen." The City's attorney and Torres-Gil went to the Property at the scheduled inspection time, but Ron did not show up. On August 15, 1991, Torres-Gil called Ron to try to reschedule the inspection before the next hearing, but Ron refused to permit the inspection.

On August 22, 1991, the date set for the continued hearing on the order to show cause, Ron failed to appear. After being advised of Ron's failure to permit the scheduled inspection, the trial court held him in contempt, issued a general arrest warrant for him, and set bail at $5,000. On August 27, 1991, Ron appeared in the department of the presiding judge for the hearing on his

motion to set aside the denial of the peremptory challenge, which the presiding judge denied. After this hearing, the City's attorney provided a bailiff with a copy of the outstanding arrest warrant, and Ron was taken into custody. Two bailiffs brought Ron to the judge assigned to the order to show cause, who ordered Ron jailed for five days for contempt of court.

On September 6, 1991, Ron appeared at the next hearing on the order to show cause. When the trial court asked him to explain why he had refused to permit an inspection of the Property on August 13, 1991, as ordered, Ron replied, "[t]he power of attorney that I had to handle this matter ran out as of the 21st [of August] according to the recording, but it was revoked as of August the 3rd, your honor. This property is owned by Gertrude Daley." In light of the alleged revocation of Ron's power of attorney to act on behalf of Gertrude, the court once again continued the hearing on the order to show cause, ordering both Ron and Gertrude to appear personally at the next hearing.

On September 13, 1991, both Ron and Gertrude appeared in court. Gertrude confirmed she owned the Property, that Ron had been repairing it for her, that she had authorized Ron to appear for her at the previous hearings, and that she had revoked his power of attorney on August 3, 1991. The court then ordered Gertrude to permit an inspection of the Property on September 19, 1991, at 2 p.m., authorizing forcible entry in the event an inspection was denied. The court refused to permit Ron to participate in the hearing, stating "You have no standing in this case. You don't have a power of attorney. You don't own the property. . . . [¶] You can't unless you're an attorney. You can't speak on behalf of your mother."

On September 23, 1991, the parties appeared in court to report on the September 19, 1991, inspection. This time Gertrude was accompanied by a different son, Phillip Daley, who stated he was a licensed contractor and was helping his mother repair the Property. Torres-Gil testified as to the contents of the City's inspection report, which was introduced as an exhibit. According to the report, most of the nine violations listed in exhibit B to the City's complaint had either not been corrected or had been corrected without proper permits. The report also enumerated the plumbing and electrical problems referred to in items 8 and 9 of exhibit B. (See *ante*, p. 737.) Finally, the report set forth 20 additional violations of the San Francisco Municipal Code observed during the inspection.

At the conclusion of the hearing, the court continued the matter for another month, ordering Gertrude "to get the necessary permits to either correct the work that has been done illegally or the work that needs to be

done and be back in court in thirty days showing proof that permits have been issued and the work is going to be done, and I am going to issue an order on that." The court warned Gertrude "[i]f you don't get those permits in thirty days, I am going to have to require the City to go in and do the work for you." As promised, the court confirmed its ruling in a written order, which ordered Gertrude to "apply for and obtain a building permit application to correct the outstanding violations within 30 days hereof." Following this hearing, the City, citing continued noncompliance with the judgment, noticed a motion for the appointment of a receiver to correct the outstanding violations at the Property.

On November 1, 1991, the trial court held a combined hearing on the outstanding order to show cause and the City's motion for the appointment of a receiver. This time Gertrude was accompanied by Ron. The court asked Gertrude whether she had complied with the court's order that she apply for and obtain a building permit application to correct the outstanding violations at the Property. Gertrude replied that she had obtained a permit. The City's attorney then explained, "[t]he building permit that has been obtained by Mrs. Daley is an over the counter permit for smoke detectors, dry rot, insulation and other minor matters that don't even begin to address the items in the injunction or the items in the [inspection report]. The total cost of this job is estimated at $970.00 which would not even begin to cover the amount of work necessary to fix the violations on the property. This is simply insufficient to satisfy this court's order of September 23rd ordering Mrs. Daley to obtain a complete building permit application." Gertrude attempted to defer to Ron for a response, but the City's attorney objected that he had no standing to participate in the proceeding. The court, citing three years of noncompliance, granted the City's request for appointment of a receiver. At this point, Ron requested a continuance so that Gertrude could hire an attorney, but the court stated that it had already ruled.

The court subsequently confirmed its appointment of a receiver in a written order. The stated purpose of the receivership was "to make necessary repairs and alterations to bring the property into full compliance with the San Francisco Municipal Code." Among other things, the receiver was granted the powers enumerated in Code of Civil Procedure section 568[4] and was authorized "[t]o undertake, to employ and to enter into contracts with persons and services as necessary to repair the Property." However, the

---

[4]Code of Civil Procedure section 568 provides "[t]he receiver has, under the control of the court, power to bring and defend actions in his own name, as receiver; to take and keep possession of the property, to receive rents, collect debts, to compound for and compromise the same, to make transfers, and generally to do such acts respecting the property as the court may authorize."

receiver was ordered to "conduct a study of the estimated cost of repairs and report to the court on the feasibility of rehabilitation prior to beginning such repairs." Gertrude has filed a timely notice of appeal from the order appointing a receiver.[5] (See Code Civ. Proc., § 904.1, subd. (g) [order appointing a receiver is appealable].)

## II. DISCUSSION

### A. *The Trial Court Had the Authority to Appoint a Receiver to Enforce Its Judgment.*

The trial court's written order appointing a receiver cites Code of Civil Procedure former section 564, subdivision 3, as the basis for the receivership.[6] This statute has been recodified in identical language as Code of Civil Procedure section 564, subdivision (b)(3),[7] which provides as follows: "In superior court a receiver may be appointed by the court in which an action or proceeding is pending, or by a judge thereof, in the following cases: . . . [¶] After judgment, to carry the judgment into effect." The relevant inquiry in this case is whether the trial court had the authority to appoint a receiver to carry its November 22, 1988, judgment into effect.

Gertrude contends the provisions of Code of Civil Procedure section 564, subdivision (b)(3), are inapplicable to abatement proceedings. In support of this argument, she cites *People* v. *Bergholm* (1960) 181 Cal.App.2d 778 [5 Cal.Rptr. 608]. In *Bergholm*, the owner of a junkyard and the County of Contra Costa stipulated to a judgment declaring the junkyard to be a public nuisance, ordering the owner to abate the nuisance, and providing for the appointment of a commissioner to abate the nuisance in the event the owner failed to do so within a specified time. (*People* v. *Bergholm, supra,* 181 Cal.App.2d at pp. 779-780.) When the owner failed to abate the nuisance within the specified time, the trial court held him in contempt and

---

[5]The notice of appeal was signed by both Ron and Gertrude. However, only Gertrude filed an appellate brief. Accordingly, we deem Ron's appeal to have been abandoned.

[6]The trial court's order also cites Code of Civil Procedure former section 564, subdivision 8 (now § 564, subd. (b)(8)), and "the inherent power of the equity court to appoint a receiver to abate the Municipal Code violations existing on the Property," as bases for the receivership. In light of our conclusion Code of Civil Procedure former section 564, subdivision 3, authorized the appointment of a receiver in this case, we need not consider the propriety of these alternative bases for the appointment. For the same reason, we need not consider the applicability of Health and Safety Code section 17980.7, subdivision (c), which authorizes the appointment of a receiver to abate code violations in certain enumerated circumstances. This statute does not affect the availability of a receiver under Code of Civil Procedure section 564. (See Health & Saf. Code, § 17980.7, subd. (g) ["These remedies shall be in addition to those provided by any other law."].)

[7]For ease of reference, we will refer to the current version of the statute throughout the remainder of this opinion.

appointed a commissioner to abate the nuisance. (*Id.* at p. 780.) The owner later appealed from a judgment accepting and approving the commissioner's report following the abatement of the nuisance. (*Id.* at p. 779.) On appeal, the owner contended, inter alia, that the court should have appointed a receiver to abate the nuisance, rather than a commissioner. (*Id.* at p. 782.) The Court of Appeal disagreed, reasoning as follows:

"Section 564 of the Code of Civil Procedure provides that 'a receiver may be appointed . . . after judgment, to carry the judgment into effect.' The section is permissive only and there may be cases where this procedure should be followed to avoid irreparable injury to the parties or an invasion of their constitutional rights. We are satisfied that this is not such a case. One of the principal purposes of a receivership is the preservation of property pending litigation concerning or affecting it, so that the relief ultimately awarded by the judgment may be effective. [Citation.] Ordinarily, receiverships are time-consuming and are not designed to accomplish the prompt action required in the abatement of a nuisance. Inherent in the processes of abatement is the requirement that the agent of the court act with reasonable expedition but at the same time refrain from acts not contemplated by or not reasonably necessary to the execution of the order. Appellant admitted that he was maintaining a nuisance and that it must be abated. He said nothing about a receiver but stipulated that the court might appoint a commissioner. He was given more than seven months to comply with the order and by his failure to act impliedly consented once more to action by a commissioner. . . . Under all the circumstances, and particularly in view of the stipulation, we are of the opinion that the court had jurisdiction to proceed as it did." (*People* v. *Bergholm, supra,* 181 Cal.App.2d at pp. 783-784.)

Gertrude contends the above language from *Bergholm* "exclud[es] subsection [(b)](3) of [Code of Civil Procedure] § 564 as a basis of jurisdiction for a receiver to abatement proceedings." Not so. In *Bergholm,* it was the property owner, not the governmental entity, who argued for a receivership, contending the appointment of a commissioner was inadequate to protect his rights. In this context, the *Bergholm* court observed the appointment of a receiver is more time-consuming than the appointment of a commissioner. (*People* v. *Bergholm, supra,* 181 Cal.App.2d at p. 783.) Given that the property owner had previously stipulated to the appointment of a commissioner, he could not be heard to insist upon the more time-consuming process of a receivership. (*Id.* at pp. 783-784.) Far from suggesting receivers could never be used to carry judgments in abatement proceedings into effect, the *Bergholm* court expressly recognized "there may be cases where this procedure should be followed to avoid irreparable injury to the parties or an invasion of their constitutional rights." (*Id.* at p. 783.)

The plain language of Code of Civil Procedure section 564, subdivision (b)(3), permits the appointment of a receiver "[a]fter judgment, to carry the judgment into effect." There is nothing in the statute to suggest the Legislature intended to exclude judgments in abatement proceedings from the scope of this statutory authorization to appoint receivers. Accordingly, we hold that Code of Civil Procedure section 564, subdivision (b)(3), gives trial courts the discretion to appoint receivers to carry judgments in abatement proceedings into effect.

### B. *The Trial Court Did Not Abuse Its Discretion by Appointing a Receiver in This Case.*

■ We review a trial court's decision to appoint a receiver to carry a judgment into effect for an abuse of discretion. " ' "The rule is established that the appointment of a receiver rests largely in the discretion of the trial court and that its action in appointing a receiver or its refusal of an application for the appointment of such an officer will not be disturbed in the absence of a showing that the court's discretion has been abused." ' [Citation.]" (*Alderson* v. *Alderson* (1986) 180 Cal.App.3d 450, 467 [225 Cal.Rptr. 610]; *Sibert* v. *Shaver* (1952) 113 Cal.App.2d 19, 21 [247 P.2d 609]; *Elson* v. *Nyhan* (1941) 45 Cal.App.2d 1, 4-5 [113 P.2d 474].) ■ Gertrude advances three main arguments in support of her assertion the trial court abused its discretion by appointing a receiver in this case. We address each of these arguments in turn.

First, Gertrude seeks to invoke the rule that the appointment of a receiver is a drastic remedy to be employed only in exceptional circumstances. ■ As stated by the court in *Elson* v. *Nyhan, supra,* 45 Cal.App.2d at page 5, "[r]eceivers are often legal luxuries, frequently representing an extravagant cost to a losing litigant. When it appears that no reasonably certain benefit will result to one litigant, and a distinct disadvantage will result to another, courts should weigh carefully the propriety of appointing a receiver."

■ Although Gertrude correctly recites the applicable rule of law, her argument proves too much. The procedural history of this case, as set forth in great detail above, demonstrates beyond peradventure that this is an exceptional case warranting the appointment of a receiver. Gertrude and her agent Ron repeatedly thumbed their noses at the City's efforts to inspect the Property and refused to abate the public nuisance and code violations existing at the Property. They transferred title to the Property at will in an effort to avoid responsibility. They consistently pointed to each other when confronted with their failure to take remedial action and their flagrant

violations of court orders. Under these circumstances, it is difficult to imagine why the trial court would not have appointed a receiver.

Second, Gertrude argues the trial court abused its discretion by appointing a receiver because it failed to consider remedies short of a receivership. ■ We note at the outset that the availability of other remedies does not, in and of itself, preclude the use of a receivership. (*Sibert* v. *Shaver, supra,* 113 Cal.App.2d at p. 21.) Rather, a trial court must consider the availability and efficacy of other remedies in determining whether to employ the extraordinary remedy of a receivership. (*Alhambra-etc. Mines* v. *Alhambra G. Mine* (1953) 116 Cal.App.2d 869, 873 [254 P.2d 599].)

■ In this case, Gertrude's contention the trial court failed to consider options short of a receivership is utterly unsupported by the record. Gertrude's assertion the trial court should have sought to achieve compliance by cutting electricity and water service to the Property, which she maintains was continuously unoccupied, is nonsensical. If jailing Gertrude's son for contempt for five days was ineffective to secure compliance, we cannot fathom why cutting off electricity and water service to an unoccupied piece of property would have been any more effective. Gertrude's contention the City should have "attempt[ed] to seize the property under eminent domain, or otherwise, to demolish it" is similarly misplaced. There is no evidence the City had any interest in acquiring the Property for a public use (see Cal. Const., art. I, § 19) and, hence, no reason to have required the City to exercise its powers of eminent domain. And, contrary to Gertrude's suggestion, the trial court did offer demolition as an option. The court's November 22, 1988, judgment expressly gave Gertrude the option to apply "for a permit to demolish the structure at said premises." Likewise, the record belies Gertrude's claim "[n]o sanctions were ever granted against [her]." The trial court jailed Gertrude's son for contempt. Since Gertrude readily admitted her son had been acting as her agent, the contempt citation was, for all intents and purposes, a sanction against her.

Finally, Gertrude contends the trial court abused its discretion by authorizing the receiver to correct all outstanding code violations at the Property. According to Gertrude, the receiver's authority should have been limited to correcting the violations specifically identified in exhibit B to the City's complaint. We disagree.

By its own terms, the list of violations set forth in exhibit B was not intended to be exhaustive. Exhibit B expressly notes "[t]he violations listed herein are those that were observed, and do not include violations which may

be concealed and which become evident when work is begun." Nor is the judgment limited to the violations set forth in exhibit B. Rather, the judgment requires Gertrude to apply "for any and all building permits required by law to perform all work necessary to cause said premises, and all parts thereof, to conform to law." Contrary to Gertrude's assertion, the receivership order does not "confer on the receiver the power to virtually renovate the premises to his taste and at no limitation of cost." The order requires the receiver to "conduct a study of the estimated cost of repairs and report to the court on the feasibility of rehabilitation prior to beginning such repairs." This procedure affords an ample safeguard against the excesses Gertrude fears.

C. *The Trial Court Provided a Fair Hearing Prior to the Appointment of a Receiver.*

■ Gertrude contends the hearing on the appointment of a receiver was unfair. This contention does not merit an extended discussion.

First, Gertrude argues that given her hearing problems and her age (81 years), the trial court should have permitted her son Ron to assist her at the hearing. In light of the fact Gertrude had previously revoked Ron's power of attorney (directly contradicting Ron's representation the power of attorney would be extended) and then used this revocation as a justification for violating an outstanding court order, the trial court's decision not to permit further participation by Ron was fully justified.

Second, Gertrude asserts the trial court's previous order did not apprise her of the scope of the permit she was being required to obtain. In fact, the previous order stated she was to "apply for and obtain a building permit application *to correct the outstanding violations.*" (Italics added.) The judgment entered three years earlier also identified the scope of the required permit, requiring Gertrude to apply "for any and all building permits required by law *to perform all work necessary to cause said premises, and all parts thereof, to conform to law.*" (Italics added.)

Finally, Gertrude contends the trial court should have granted Ron's request for a continuance of the receivership hearing. There are two procedural reasons why a continuance was properly denied—the request for a continuance was made by Ron, not Gertrude, and it was made after the trial court had already ruled. There is also a major substantive reason why a continuance was properly denied—Gertrude and Ron had already been given three years to abate the public nuisance at the Property and had failed to do so.

## III. DISPOSITION

The judgment is affirmed, with costs to the City.

Kline, P. J., and Phelan, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 16, 1993.