[No. B169072. Second Dist., Div. Five. Dec. 23, 2003.]

CHARLES GOLD et al., Plaintiffs and Respondents, v.
RICHARD E. GOLD et al., Defendants and Appellants.

**COUNSEL**

Morrison & Foerster, Shirley M. Hufstedler, Michael C. Cohen and John W. Alden Jr. for Defendants and Appellants.

Manatt, Phelps & Phillips and David Elson for Plaintiffs and Respondents.

**OPINION**

**TURNER, P. J.—**

## I.   INTRODUCTION

Defendants Richard E. Gold, Emily Gold Mears, and Jean Gold Friedman, appeal from a July 28, 2003, order appointing a limited purpose receiver to market and sell real property which was the subject of a September 26, 1996, judgment entered by now retired Judge Richard G. Harris. We affirm the July 28, 2003, order because the trial court did not abuse its discretion in appointing a limited purpose receiver to enforce the terms of the September 26, 1996, judgment ordering the marketing and the sale of the property.

## II.   BACKGROUND

The parties in this action are relatives who own shares in three closely held real estate corporations: Gold Realty Company; Gold's Incorporated; and Essex Corporation. The corporations were formed by the family patriarch, Morris Gold, who was the husband of Julia[1] and the father of Richard and Ruth. Ruth married Charles Gold. Prior to his marriage to Ruth, Charles was not a member of the Gold family. Ruth and Charles had two sons, Robert and David. Richard and his wife Harriet had two daughters, Jean Gold Friedman and Emily Gold Mears. Julia died on November 6, 1990. Morris died on April 2, 1992.

Morris was a highly successful businessperson, who started out in the furniture business in the 1920's. He subsequently acquired considerable real

---

[1] For purposes of clarity and not out of any disrespect, we will refer to members of the Gold family by their first names.

estate which composed the assets of the three corporations. Beginning in the 1940's, Richard and Charles participated in the management of the corporations. In 1967, Richard decided to return to graduate school. Richard then stopped assisting Morris in running the corporations. In 1977, Charles stopped working for the family business and Richard returned. The family members were not allowed to draw salaries from the corporations. The profits were reinvested in the corporations. After Morris died, Richard ran the corporations with the assistance of an outside management company.

The family members owned all the shares of stock. Prior to Morris's death, Richard's family and Charles's family owned equal shares of stock in the corporations. Morris died on April 2, 1992, and left a will. In the will, Morris left a larger portion of the estate to Richard's family. As a result, Charles's family owned 40 percent of the shares of the corporations. Richard's family owned 60 percent of the shares. This uneven split was the result of Morris's displeasure with some members of Charles's family. Morris apparently felt that Charles did not work hard enough. Morris also did not approve of the woman a grandson, Robert, had chosen to marry. Morris also felt that Robert was "an unconcerned and unloving grandchild." Morris disinherited Charles and Ruth. Robert was initially disinherited by Morris. But later, in 1986, Robert was reinstated as a beneficiary in Morris's will.

In 1988, prior to Morris's death, the stockholders (Morris, Richard, Harriet, Charles, Ruth, Jean, Emily, David and Robert) of Gold's Incorporated executed voting trust agreements for the three corporations. As part of the agreements, the shareholders agreed that Richard had the exclusive right to vote all corporate shares for up to 10 years. In 1991, two of the corporations, Essex Corporation and Gold Realty Company, were converted from "subchapter C corporations" to "subchapter S corporations." The conversions avoided double taxation of corporate earnings. In addition, the change resulted in the family shareholders' receiving dividends for the first time.

After Morris died in 1992, Charles's family refused to convert the third corporation, Gold's Incorporated, to "subchapter S corporation" status. Richard's family and Charles's family become embroiled in litigation over the operation of the corporations. As noted previously, when Morris died in 1992, the corporations were being managed by Richard. On February 16, 1994, plaintiffs, Charles Gold, Ruth Gold, Charles I. Gold, the Ruth Gold Family Trust, Robert L. Gold, and David G. Gold, filed suit action against defendants for involuntary dissolution of the corporations and for damages based on numerous tort theories. It is this lawsuit nearly one decade later that is the subject of this appeal. Named as plaintiffs in the February 16, 1994, complaint were Charles, his spouse Ruth, and their sons Robert and David. Plaintiffs prevailed only on the cause of action for involuntary dissolution of

the corporations. Former Judge Harris found that the corporations had been adequately run and that Richard had not been guilty of fraud or mismanagement. However, former Judge Harris concluded that Richard had been operating a "one-man show" which had resulted in persistent unfairness to plaintiffs. In order to protect the rights and interests of plaintiffs, former Judge Harris ordered dissolution of the three corporations pursuant to Corporations Code section 1800, subdivision (b)(4) and (5). Former Judge Harris ordered that Gold's Incorporated be dissolved within one year. However, to avoid adverse tax consequences, former Judge Harris ordered that dissolution of the two subchapter S corporations, Essex Corporation and Gold Realty Company, be delayed until January 1, 2003, and July 1, 2003, respectively. Former Judge Harris retained jurisdiction "until the dissolutions and liquidations contemplated herein have been fully consummated."

Richard was allowed to remain as president of the corporations but each entity's three-member board of directors would include one director to represent both plaintiffs and defendants. Under the terms of the September 26, 1996, judgment, an independent third director could be chosen by agreement or appointment of the trial court. The September 26, 1996, judgment provided in part: "During the period prior to the liquidation of Defendants Gold Realty Company, Gold's [Incorporated] and Essex Corporation, the corporations shall be operated in the following manner: [¶] . . . [¶] (c) The Board of Directors of each corporation shall be comprised of three directors: Richard E. Gold, or one member from his family; Charles I. Gold, or one member from his family; and an individual who shall be agreed upon by both the Richard Gold family and the Charles Gold family. This individual shall serve as a director until the next annual shareholder/trust certificate holder meeting. If the Richard Gold family and the Charles Gold family at any time cannot agree upon the third director, such director shall be appointed by the Court upon application duly made and noticed; the above described procedure for the election of three directors for each of the corporations shall be repeated annually until the Board of Directors of that corporation is disbanded upon the conclusion of corporate dissolution and distribution of the proceeds to all shareholders/trust certificate holders . . . ."

At issue in this case is whether a subsequent appointment of a receiver to accomplish the dissolution of two of the corporations was appropriate. In that respect, the September 26, 1996, judgment itself does not appoint a receiver. However, in rendering the September 26, 1996, dissolution judgment, former Judge Harris adopted his findings and conclusions contained in a tentative decision dated May 1, 1996, which were adopted by him in his statement of decision on May 30, 1996. In the May 1, 1996, tentative statement of decision, former Judge Harris stated, "The Court expressly rejects the idea of appointing a Receiver for the S corporations, or either of them, *at this time*."

(Italics added.) However, the September 26, 1996, judgment provides, "Jurisdiction is expressly retained in this Court until the dissolutions and liquidations contemplated herein have been fully consummated." Notices of appeal and cross-appeal were filed on October 8 and 25, 1996, respectively from the September 26, 1996, judgment. In an unpublished opinion, we affirmed the judgment in all respects. (*Gold v. Gold Realty Company* (Apr. 15, 1998, B106945) [nonpub. opn.].)

Both sides subsequently agreed that Fred Nicholas, a nonpracticing lawyer with real estate experience would become the third director. While Mr. Nicholas was a director, two pieces of three real·estate properties owned by Gold's Incorporated were sold. However, after serving two years, at the request of members of plaintiffs' family, Mr. Nicholas resigned amid acrimony over the sale of the remaining parcel owned by Gold's Incorporated.

Plaintiffs then filed a motion for appointment of one of five retired jurists as the third director of the corporations. Retired Associate Justice John Zebrowski was appointed as the third director. However, retired Associate Justice Zebrowski would only agree to the appointment subject to stipulations by the parties including that his appointment was as a reference pursuant to Code of Civil Procedure[2] section 638 with judicial immunity. The parties also had to agree not to sue retired Associate Justice Zebrowski.

The acrimony between the two families, however, did not cease with retired Associate Justice Zebrowski's appointment. Rather, Richard, the director aligned with defendants, disagreed on a number of issues, including whether retired Associate Justice Zebrowski was actually reelected as a director at the annual stockholders meetings in May 2002. In April 2002, the matter had deteriorated to the point that defense counsel wrote a letter to retired Associate Justice Zebrowski objecting to his continued service as the third director. The letter stated in part: "Richard and his family will not agree to your [retired Associate Justice Zebrowski's] continued service as the third director at the annual meeting this year. If the Charles Gold family disagrees, that opposition may well result in litigation. You would necessarily be personally involved in such future litigation. As you are aware, the two families have already experienced lengthy and costly litigation. . . ."

On May 24, 2002, defendants filed a motion for an order appointing a third director for Gold Realty Company and Essex Corporation. Defendants argued that the third director should be an experienced real estate professional who was equipped to make timely business decisions on the merits of proposed

---

[2] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

sales rather than someone like retired Associate Justice Zebrowski. Defendants nominated eight real estate executives. On June 18, 2002, plaintiffs sought clarification of the duration of the order appointing retired Associate Justice Zebrowski as director and an order providing that he would continue to carry out his duties until completion of the corporate liquidations.

On July 30, 2002, Judge Linda Lefkowitz found that the September 26, 1996, judgment required the annual election of directors and that the parties were unable to agree on a third director. Judge Lefkowitz further found that the September 26, 1996, judgment empowered the court to appoint a director in the event that the parties could not agree on the third director. Judge Lefkowitz then exercised her discretion to reappoint retired Associate Justice Zebrowski to act as the third director. After having been threatened with a legal action against his personal assets, retired Associate Justice Zebrowski subsequently declined to serve when defendants would not agree to a stipulation giving him judicial or quasi-judicial immunity.

On September 3, 2002, defendants filed an additional motion requesting a real estate professional be appointed as the corporations' third director. In November 2002, Judge Lefkowitz denied the motion and ordered that a nominee submitted by plaintiffs, retired Associate Justice Richard Neal, be appointed as the third director. In so doing, Judge Lefkowitz indicated she had reviewed the pleadings and heard extensive arguments on the disadvantages and advantages of a real estate executive versus a retired judicial officer to serve as the third director. After weighing the merits of each position, Judge Lefkowitz exercised her discretion to appoint retired Associate Justice Neal to be the third director. The parties were also ordered to obtain directors liability insurance to protect retired Associate Justice Neal.

As of January 16, 2003, no directors liability insurance could be found. In addition, defendants renewed their claim that a real estate professional rather than a retired Court of Appeal justice serve as the third director. This was based on the delay in retired Associate Justice Neal's appointment due to negotiations between the parties over the liability protections that should be afforded him for acting as the third director. Plaintiffs indicated that they were willing to agree to retired Associate Justice Neal's request for quasi-judicial immunity. At a February 27, 2003, hearing, Judge Lefkowitz indicated that, contrary to defendants' request, she was unwilling to reconsider the ruling appointing retired Associate Justice Neal rather than a more experienced real estate professional. In addition, Judge Lefkowitz refused to address plaintiffs' request to comply with retired Associate Justice Neal's requirement that he be provided quasi-judicial immunity. Instead, Judge Lefkowitz urged the parties to reach an amicable settlement and set the matter for a status conference on April 8, 2003.

At the April 8, 2003, status conference, Judge Lefkowitz requested briefing on the issue of whether retired Associate Justice Neal should be appointed as a receiver. Judge Lefkowitz indicated that she had read the status reports from both plaintiffs and defendants. Judge Lefkowitz then stated: "While I'll be more than happy to hear from both sides, I must tell you, having wrestled with this issue all weekend after looking at the status conference statements, I am, somewhat reluctantly—my intent this morning is to set this some point in June for time for both parties to argue at some length whether, given everything that has occurred in this case—which I will not put forth on the record today . . . at this point out it is appropriate for this court to appoint a receiver."

After defense counsel suggested that the statutory issue should be addressed, Judge Lefkowitz continued: "I know you have done that in great part but I certainly don't want to undertake the kind of action that—I noted you used the term 'drastic.' That term has been used by the courts. It is something that the court does not reach easily but it is, of course, an option where, when the court has not had any success in utilizing a provisional directorship— which, of course, I think speaks for itself at this point. [¶] I don't know any way else to effect [former] Judge Harris's order. My recollection of his order was that he declined to impose a receivership upon these corporations, and he used the term 'yet.' I think the 'yet' may well have arrived. [¶] There are parties here who, despite urgings of this court, as well as the California Court of Appeal, appear absolutely disposed not to cooperate in any meaningful way with each other on issues that I think—I think, as have other courts, pertain to the ultimate peace of these families. And I see no way to impose the sale of the properties—at least, at this point—that [former] Judge Harris ordered be sold, while providing a protection that the person charged with assisting in that is entitled to, without imposing something greater than a provisional directorship. I just don't see any mechanism . . . for effecting voluntary agreement between these two families." Judge Lefkowitz continued the matter to June 5, 2003, to allow the parties to brief the issue of whether a receiver should be appointed.

Defendants opposed the appointment of retired Associate Justice Neal as the receiver of the corporations. The opposition was based on the grounds: the September 26, 1996, judgment did not authorize the appointment of a receiver; the superior court lacked the authority to appoint a receiver except as expressly set forth by section 564; and no circumstances justifying appointment of a receiver under section 564 existed. Richard stated in a declaration the appointment of a receiver would have "a substantial, deleterious effect on the selling price" on the remaining properties left to be sold. This opinion was based on his experience in operating, purchasing, and selling real properties because a receivership connotes a distress situation. Defendants also argued retired Associate Justice Neal should not be appointed

as a receiver. Defendants reasoned retired Associate Justice Neal had never been a receiver of commercial and industrial realty, which would require assistance, causing additional delay and expenses. According to defendants, the corporations were not deadlocked and the properties were regularly being sold at prices in excess of their appraised values. Richard declared that the two remaining corporations owned 19 different properties, two of which were effectively disposed of as follows: nine sales closed and the proceeds had been distributed; two properties were in escrow; one sales contract was out for signature; and since retired Associate Justice Zebrowski resigned, Richard and David had jointly approved seven sales without the assistance of a third director. According to Richard, there were particular problems related to the sale of three of the remaining properties. The first property involved a parking space issue. The second parcel involved a problem with the City of Lynwood issuing a request for proposal for the development of the property. The third property was a shopping center in Panorama City which was only one-half leased.

Plaintiffs requested retired Associate Justice Neal be appointed as a receiver. Plaintiffs argued that the trial court had the authority to exercise discretion to appoint a receiver under section 564, subdivision (b)(3), (4), and (9). David declared that: only 30 percent of the entire value of property had been sold; it was a strong seller's market that accounted for the high selling prices and not Richard's efforts; and Richard refused to present a meaningful marketing plan for listing properties in the Panorama City shopping center that comprise half the corporations' value. David reiterated the long history of contentiousness between the parties over whether he was improperly denied access to the properties, information, and documents.

Plaintiffs attached a number of documents from the former director, retired Associate Justice Zebrowski, outlining specific disputes between the parties. One such dispute is outlined in a July 8, 2001, letter from retired Associate Justice Zebrowski to Richard which states in part: "At the last Board meeting, the Board voted (with Richard dissenting) to contract for restricted appraisals of the three Essex properties. It was my understanding that Dennis Ellman would hire and interface with the appraiser. I considered this advisable in view of Richard's opposition to having appraisals done, and David's continuing reports of lack of information. It has since been suggested to me that Richard has taken charge of hiring and interfacing with the appraiser. I am concerned that this may create further delay." David declared that the special problems created with respect to the three properties had been created by Richard. According to David, Richard: refused to investigate concerns raised by David about the parking spaces with the respect to the first property; failed to list and begin marketing the Lynwood property in September 2001 as suggested by retired Associate Justice Zebrowski, which issued the request

for proposal in November 2002; and refused to present a plan to increase occupancy of the shopping center or to obtain appraisals.

The parties provided widely conflicting explanations as to the causes for the delays. Richard claimed to have met informally with David in an effort to address various questions and concerns. Richard declared that: he had not refused to schedule board meetings; David had prevented a 2002 meeting from commencing by leaving the conference room before the session could be called to order; the board had acted to resolve numerous issues; David had regularly approved Richard's proposals for sales of the properties; Richard had not unreasonably limited David's access to records and information; because of past unpleasantries, Richard would not permit David to be alone while reviewing files; and thousands of documents had been copied for David. The parties also disputed a number of other issues, including whether Richard refused to allow the board to determine the amount of reserves and distributions to shareholders. According to Richard, he only determined cash distributions in accordance with a long-standing formula adopted by a board resolution in 1997. David attended a meeting to determine reserves in December 2002, and approved the recommendation. David pointed out in his declaration that the November 1997 resolution had been adopted by Richard and a daughter before the judgment was final. David denied approving Richard's recommendation but had requested more information to support the recommendation to the board of directors.

As an additional example of how much animosity existed between the parties, in their papers, they each reiterated a long-standing conflict surrounding the circumstances of the sale of building No. 25. Richard declared that, in April 2002, he presented a "highly favorable" proposed sale of building No. 25 to the other directors. The property had been appraised at $1,650,000 but a buyer, a tenant of the building, had offered $2,450,000. David declared that Richard had entered into this agreement without considering potentially valuable signage rights. Richard called the signage right argument "overblown." As of April 2003, the property was in escrow at a $100,000 more than the original offer.

On June 5, 2003, in the face of the ever-widening conflict between the parties, Judge Lefkowitz heard arguments on whether it was necessary to appoint a receiver in order to effect the dissolution of the corporations as ordered by former Judge Harris in the September 26, 1996, judgment, which had been affirmed by us on April 15, 1998. On June 10, 2003, Judge Lefkowitz issued her ruling appointing retired Associate Justice Neal as a limited receiver. Judge Lefkowitz ruled: "The Court has power to modify a judgment to effect its ends and carry the judgment into effect. The appointment of a receiver is undertaken only in circumstances where other available

remedies are or have been shown to be inadequate. See *City [and] County of San Francisco v. Daley* (1993) 16 Cal.App.4th 734, 745 [20 Cal.Rptr.2d 256]. A court has inherent equitable power to appoint a receiver on its own motion where essential to accomplish a judicial objective. Code of Civil Procedure section 564[, subdivision] (b)(3) [&] (4); Corporations Code, sections 1803, 1804; *McCarthy v. Poulsen* (1985) 173 Cal.App.3d 1212, 1219 [219 Cal.Rptr. 375]. *McCarthy* is particularly appropriate when applied to the circumstances in the instant case: the resignation of a Trustee who could not be replaced since, despite efforts by the parties and the Court, no one would consent to become a successor Trustee for fear of incurring personal liability. A court may appoint a 'limited purpose receiver,' leaving the parties to operate remaining aspects of a business. See, e.g., *Raff v. Raff* (1964) 61 Cal.2d 514 [39 Cal.Rptr. 366, 393 P.2d 678]. Moreover, it is noted, albeit without citation, in Weil and Brown, Civil Procedure Before Trial, section 9:748 that a limited purpose receiver, 'may even be given a different title so as not to upset business relationships.' [¶] This Court has been presented with a tentative decision issued in May[] 1996, and judgment dated September 26, 1996, requiring, inter alia, that three family-owned corporations liquidate their assets and dissolve. Recognizing tax implications involving the liquidation and dissolution, the court set forth a schedule for completion of the provisions of the judgment. . . . Richard Gold has submitted through counsel the minutes of the shareholder and Board of Director meetings of the involved corporations which appear to reflect that only Essex and Gold Realty [Company], have remaining properties. Gold's [Incorporated], has, in fact, dissolved. Gold Realty [Company] owns the majority of remaining properties. In relevant portion, the judgment required that liquidation and dissolution of Essex Corporation be completed by January[] 2003 ('Essex Target Date'); that liquidation and dissolution of Gold's Realty [Company], be completed by July[] 2003 ('Gold's Realty Target Date'). . . . These deadlines have not been met. The minutes reflect various reasons presented by defendant Richard Gold why the involved property sales have not occurred. Plaintiffs disagree with the explanation for delay in sales. . . . As to those sales most recently completed, a review of the record reflects that [retired Associate] Justice Zebrowski, who served as the most recent provisional director, was the moving force in the majority of the sales. The record equally reflects that, as has been the case for over a decade, the parties appear unable to reconcile their differences to accomplish the liquidation and dissolution process without court intervention. [¶] Two appointed provisional directors have declined to continue their appointed positions. The second, Honorable John Zebrowski, Retired, did so amid concerns imposed by memoranda and letters from the Richard Gold family that he might be the subject of a tort action. Faced with the families' inability to agree upon a new provisional director, the Court appointed the Honorable Richard Neal, Retired. The parties have been unable to agree upon any contractual protection

for [retired Associate] Justice Neal against suit; there is no insurer willing to provide errors and omissions protection. [¶] Defendants' response is that two of their past nominees for director have expressed a willingness to serve without contractual protection. There are no declarations to that effect; not surprisingly, in the context of this twenty-year litigation, plaintiffs are equally opposed to defendants' nominees. [¶] In sum, under circumstances analogous to the *McCarthy* case, the Court has been unable to appoint a provisional director. The parties seem unable to do other than obstruct each other at every turn. The liquidation process is well beyond its completion date and negotiations for the sale of the remaining properties are not progressing. For these reasons, and in aid of and enforcement of the already untimely liquidation and dissolution of Essex [Corporation] and Gold Realty [Company], the Court modifies the judgment and appoints [retired Associate] Justice Neal as receiver for the property currently held by the two corporate entities. Only in this manner can the Court afford the requisite personal liability protection which is necessary to fulfill a neutral's role in the Court's enforcement of the prior orders, rulings and judgment issued. *Jun v. Myers* (2001) 88 Cal. App. [4th] 117, 124 [105 Cal.Rptr.2d 537], [f]n. 5."

On July 28, 2003, Judge Lefkowitz issued an order appointing retired Associate Justice Neal as the receiver to market and sell the remaining corporate properties. On August 1, 2003, defendants filed a notice of appeal from the order appointing retired Associate Justice Neal as a receiver. On August 7, 2003, we denied defendants' request for an immediate stay of enforcement of Judge Lefkowitz's July 28, 2003, order appointing a receiver. On August 11, 2003, we denied defendants' motions for stay and to reduce the undertaking required by section 917.5 pending disposition on appeal. Because of the delays to date, this case was granted a California Rules of Court, rule 19 calendar preference. With the parties' consent, no extensions of time to file briefs were granted.

### III.   DISCUSSION

#### A.   Introduction

The issue in this case is whether Judge Lefkowitz properly appointed a limited receiver to market and sell the properties remaining in the two corporations which are subject to a September 26, 1996, dissolution judgment. Defendants argue we must reverse the order appointing the receiver to market and sell the corporate property on the grounds Judge Lefkowitz lacked: (1) authority to appoint a receiver; (2) authority to substantively modify the judgment; and (3) jurisdiction to appoint a receiver when a legal remedy of appointing a third director of the corporations was adequate. We respectfully disagree with defendants' contentions.

## B.    Jurisdiction to Appoint a Receiver

There is statutory authority for appointing a receiver to enforce the terms of the September 26, 1996, dissolution judgment. Section 564 provides in part: "(a) A receiver may be appointed, in the manner provided in this chapter, by the court in which an action or proceeding is pending in any case in which the court is empowered by law to appoint a receiver. [¶] (b) A receiver may be appointed by the court in which an action or proceeding is pending, or by a judge thereof, in the following cases: [¶] . . . [¶] (3) After judgment, to carry the judgment into effect. [¶] (4) After judgment, to dispose of the property according to the judgment, or to preserve it during the pendency of an appeal, or pursuant to the Enforcement of Judgments of Law (Title 9 (commencing with Section 680.010)), or after sale of real property pursuant to a decree of foreclosure, during the redemption period, to collect, expend, and disburse rents as directed by the court or otherwise provided by law." The plain language of the Code of Civil Procedure gives the superior court power to appoint a receiver after judgment for two purposes. First, a receiver can be appointed to carry the judgment into effect. (§ 564, subd. (b)(3).) Second, a receiver may be appointed to depose of property according to the previously entered judgment. (§ 564, subd. (b)(4).) In essence, a receiver may be appointed to enforce a judgment. (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2003) ¶ 9:737, p. 9(II)-48.9.) In order to carry the September 26, 1996, dissolution judgment into effect, Judge Lefkowitz clearly had the authority under section 564, subdivision (b)(3) and (4) to appoint a receiver to dispose of the properties. (See *City and County of San Francisco, supra,* 16 Cal.App.4th at p. 743.)

More specifically, Corporations Code section 1800 gives the superior court jurisdiction over an action for the involuntary dissolution of a corporation. The powers granted to the superior court include the appointment of a receiver upon the filing of a complaint for dissolution of the corporation. (Corp. Code, § 1803[3]; *Chapin v. Gritton* (1960) 178 Cal.App.2d 551, 564 [3 Cal.Rptr. 250].) And, once a decree of dissolution has been made, the court

---

[3] Corporations Code section 1803 provides: "If, at the time of the filing of a complaint for involuntary dissolution or at any time thereafter, the court has reasonable grounds to believe that unless a receiver of the corporation is appointed the interest of the corporation and its shareholders will suffer pending the hearing and determination of the complaint, upon the application of the plaintiff, and after a hearing upon such notice to the corporation as the court may direct and upon the giving of security pursuant to Sections 566 and 567 of the Code of Civil Procedure, the court may appoint a receiver to take over and manage the business and affairs of the corporation and to preserve its property pending the hearing and determination of the complaint for dissolution."

has broad powers to make "such orders and decrees . . . in the case as justice and equity require." (Corp. Code, § 1804.)[4]

### C. Whether Judge Lefkowitz Had the Jurisdiction to Appoint a Receiver When the September 26, 1996, Judgment Did Not Do So

■ Defendants contend that Judge Lefkowitz's only authority was to appoint a third director. Defendants reason Judge Lefkowitz lacked the authority to appoint retired Associate Justice Neal because former Judge Harris's September 26, 1996, judgment does not authorize the appointment of a receiver. As noted above, the September 26, 1996, judgment ordered the dissolution of the three corporations owned by the parties. However, in order to avoid adverse tax consequences, the September 26, 1996, judgment also delayed dissolution of the two S corporations. As previously noted, with respect to the issue of a receivership over the dissolution process, the statement of decision provides: "The Court expressly rejects the idea of appointing a Receiver for the S corporations, or either of them, *at this time*." (Italics added.) However, as previously explained, the September 26, 1996, judgment also states, "Jurisdiction is expressly retained in this Court until the dissolutions and liquidations contemplated herein have been fully consummated." In an analogous situation, the California Supreme Court has noted: "[T]he court may change the mode or procedure in executing its decrees although the decree specifies a particular method. The time for performance specified in the decree may be extended. (*Gibson* v. *River Farms Co.* (1942) 49 Cal.App.2d 278 [121 P.2d 504].) There is a clear distinction between material adjudicated portions of a judgment or decree, and mere procedural matters incident to the determined issues, which are incorporated as the proposed means of fulfilling the judgment. It has been held in California that when a decree or judgment reserves jurisdiction to change or modify mere procedural provisions, as distinguished from material adjudications of substantial issues, it is not an abuse of discretion for the court to extend the time limit. [Citations] [¶] In *Los Angeles A. T. Co.* v. *Superior Court* (1928) 94 Cal.App. 433, 439–441 [271 P. 363], the time for making a designated payment was extended five successive times. It was held that these orders did not constitute a material change in substantial adjudicated portions of the judgment, but that they merely applied to procedural matters intended to accomplish the enforcement of the judgment and constituted a valid exercise of jurisdiction retained by the court." (*Lesser & Son* v. *Seymour* (1950) 35 Cal.2d 494, 500 [218 P.2d

---

[4] Corporations Code section 1804 provides in its entirety: "After hearing the court may decree a winding up and dissolution of the corporation if cause therefor is shown or, with or without winding up and dissolution, may make such orders and decrees and issue such injunctions in the case as justice and equity require."

536]; see *Dennis v. Overholtzer* (1961) 191 Cal.App.2d 791, 798 [13 Cal.Rptr. 110]; *Los Angeles A. T. Co.* v. *Superior Court, supra,* 94 Cal.App. at p. 435.) By contrast, jurisdiction may not be retained to materially change the adjudication of substantial issues. (*Bernardi v. City Council* (1997) 54 Cal.App.4th 426, 439, fn. 12 [63 Cal.Rptr.2d 347]; *Palo Alto-Menlo Park Yellow Cab Co. v. Santa Clara County Transit Dist.* (1976) 65 Cal.App.3d 121, 130 [135 Cal.Rptr. 192]; *Orban Lumber Co. v. Fearrien* (1966) 240 Cal.App.2d 853, 855–856 [50 Cal.Rptr. 41].)

It has been held that a superior court order directing a receiver to sell property that is subject to a decree of dissolution or liquidation is merely procedural and does not affect the substantive rights of the parties. (*Lesser & Son v. Seymour, supra,* 35 Cal.2d at p. 499; *Marsch v. Williams* (1994) 23 Cal.App.4th 238, 248–249 [28 Cal.Rptr.2d 402].) As the California Supreme Court explained in *Lesser & Son v. Seymour, supra,* 35 Cal.2d at page 499: "We are satisfied that a court in an equity proceeding has the power to change the manner of sale of property in its custody by a receiver appointed by it from that previously prescribed by it in the order directing the sale, and in that connection may make the sale itself although the prior order called for it to be made by the receiver. [¶] In effect, the directions in the order of sale with regard to the manner in which it should be made, are merely instructions to the receiver—his procedural directions. They do not go to the substantive rights of the parties." The reasoning behind this rule is that the primary function of the court is to manage or dispose of the property in the best manner possible and for the best interests of the parties concerned. (*Ibid.*; *People v. Riverside University* (1973) 35 Cal.App.3d 572, 583–584 [111 Cal.Rptr. 68]; *Steinberg v. Goldstein* (1954) 129 Cal.App.2d 682, 685–686 [278 P.2d 22].) The receiver is an agent and officer of the court and the property in her or his hands remains under the control and continuous supervision of the court. (*Lesser & Son v. Seymour, supra,* 35 Cal.2d at p. 499; *Marsch v. Williams, supra,* 23 Cal.App.4th at p. 248; *Turner v. Superior Court* (1977) 72 Cal.App.3d 804, 813 [140 Cal.Rptr. 475]; *People v. Riverside University, supra,* 35 Cal.App.3d at p. 583.) The Court of Appeal has held, "A receiver merely holds the custody of the property involved in the litigation, in behalf of the court for the real owners thereof, and the court may direct the delivery to the receiver of specific property which is involved in litigation." (*Steinberg v. Goldstein, supra,* 129 Cal.App.2d at p. 686; accord, *McCarthy v. Poulsen, supra,* 173 Cal.App.3d at p. 1219.) Thus, Judge Lefkowitz retained the power to change the manner of sale of property under her jurisdiction due to the September 26, 1996, dissolution decree.

Even without former Judge Harris's express retention of jurisdiction, Judge Lefkowitz had the authority to modify the judgment to carry out the decree. The Court of Appeal has explained, "An equity court has inherent power to

make its decree effective by additional orders affecting the details of performance, irrespective of reservation of power in the decree." (*Barnes v. Chamberlain* (1983) 147 Cal.App.3d 762, 767 [195 Cal.Rptr. 417]; accord, *Lesser & Son v. Seymour, supra*, 35 Cal.2d at pp. 499–500 [reservation in a decree is not required where the principles and compelling necessities of a case require the reservation of such powers]; *Estes v. Rowland* (1993) 14 Cal.App.4th 508, 536 [17 Cal.Rptr.2d 901].)

■ In this case, although former Judge Harris declined to exercise discretion at the time the judgment was entered on September 26, 1996, to appoint a receiver to carry out the terms of dissolution, he expressly retained jurisdiction until the dissolutions were accomplished. Because two of the three corporations subject to the September 26, 1996, dissolution judgment had not been dissolved by the time retired Associate Justice Neal was appointed on July 28, 2003, the superior court retained jurisdiction to dispose of the property in the best manner possible and for the paramount interests of the parties concerned. (§ 564, subd. (b)(3) & (4); Corp. Code, §§ 1800, 1803, 1804; *Lesser & Son v. Seymour, supra,* 35 Cal.2d at pp. 499–500; *People v. Riverside University, supra,* 35 Cal.App.3d at pp. 583–584; *Steinberg v. Goldstein, supra,* 129 Cal.App.2d at pp. 685–686.)

> D.  Whether Judge Lefkowitz Abused Her Discretion in
> Appointing Retired Justice Neal As a Receiver When
> the Remedy of Selecting a Third Director Remained
> Available

Finally, the fact that another potential remedy was available, appointment of a third director, did not preclude Judge Lefkowitz from appointing a receiver. Our colleague, now retired Associate Justice John E. Benson has explained, "[T]he availability of other remedies does not, in and of itself, preclude the use of a receivership. (*Sibert v. Shaver* (1952) 113 Cal.App.2d 19, 21 [247 P.2d 609].) Rather, a trial court must consider the availability and efficacy of other remedies in determining whether to employ the extraordinary remedy of a receivership. (*Alhambra-etc. Mines v. Alhambra G. Mine* (1953) 116 Cal.App.2d 869, 873 [254 P.2d 599].)" (*City and County of San Francisco v. Daley, supra,* 16 Cal.App.4th at p. 745.)

■ Judge Lefkowitz had the power to modify former Judge Harris's September 26, 1996, judgment and to dispose of the property by appointment of a receiver. Because Judge Lefkowitz had jurisdiction to appoint a receiver, we reject defendants' contention that this aspect of the July 28, 2003, order at issue is subject to de novo review. The appointment of a receiver rests within the discretion of the trial court. (*Goes v. Perry* (1941) 18 Cal.2d 373, 381 [115 P.2d 441]; *City and County of San Francisco, supra,* 16 Cal.App.4th

at p. 744; *Alderson v. Alderson* (1986) 180 Cal.App.3d 450, 467 [225 Cal.Rptr. 610]; *Sibert v. Shaver, supra,* 113 Cal.App.2d at p. 21.) The superior court's discretion to determine the necessity for the appointment of a receiver to dissolve a corporation is broad. (*Chapin v. Gritton, supra,* 178 Cal.App.2d at p. 564; *Merlino v. Fesno Macaroni Mfg. Co.* (1944) 64 Cal.App.2d 462, 467 [148 P.2d 884].) The order appointing a receiver will be reversed on appeal if there is a clear showing of an abuse of discretion. (*City and County of San Francisco v. Daley, supra,* 16 Cal.App.4th at p. 744; *In re Marriage of Economou* (1990) 224 Cal.App.3d 1466, 1484 [274 Cal.Rptr. 473]; *Sibert v. Shaver, supra,* 113 Cal.App.2d at p. 21.)

As the record aptly demonstrates, the aborted appointment of a third director has caused the dissolution process to be delayed beyond the target dates of January 2003 for Essex Corporation and July 2003 for Gold Realty Company, which were set by the September 26, 1996, judgment. This is due to the parties' inability to choose and retain a third director to accomplish the dissolution, as contemplated by the September 26, 1996, judgment. The directors and stockholders are so divided that they cannot elect a third director. Once the parties deadlocked on this issue, even the trial court's efforts to appoint a third director, as contemplated by the September 26, 1996, judgment, have been thwarted by the factions of directors and stockholders who were unable to cooperate in the process. For example, plaintiffs requested the resignation of the first director, a real estate professional that was defendants' preference for the position. Defendants then threatened the second director, a retired Court of Appeal justice, with a tort action subjecting him to personal liability if he refused to resign. In May 2002, the parties requested court intervention regarding the appointment of a third director. In November 2002, Judge Lefkowitz appointed another retired Court of Appeal justice to act as the third director to assist in implementing the September 26, 1996, judgment requiring dissolution of the corporations by sale and marketing of the property by January 2003 and July 2003. However, by January 2003, the parties had not only failed to dissolve the corporations but the parties had in effect sabotaged Judge Lefkowitz's orders appointing retired Associate Justice Neal as the third director. This was because the parties could not even agree on a method by which retired Associate Justice Neal could be protected from civil liability in the event one of the factions was dissatisfied with his votes regarding the dissolution of the corporations.

■ Understandably, no director would wish to enter into this situation without some modicum of protection for his or her personal assets. By the time retired Associate Justice Neal was actually appointed as the receiver, on July 28, 2003, the target dates had passed. It is in this scenario that Judge Lefkowitz judiciously determined that a receiver was necessary to implement the September 26, 1996, judgment ordering dissolution of the corporations by

marketing and sale of their assets. The acrimony and divisiveness created by these two factions in marketing and selling real estate by utilizing the highly unsuccessful third director procedure was sufficient to justify the appointment of a receiver to effect the terms of the September 26, 1996, judgment. For these reasons, we are unpersuaded by defendants' argument that Judge Lefkowitz was required to make an additional finding that the property was in danger of loss, removal, or injury prior to finding that a receiver was necessary to effect the dissolution judgment. No statutory provision required Judge Lefkowitz to make such an express oral or written finding. Given the considerable discretion afforded to a court in appointing a receiver, Judge Lefkowitz did not abuse her discretion on July 28, 2003, in appointing retired Associate Justice Neal as a receiver in order to implement the September 26, 1996, judgment which called for dissolution of the corporations and liquidation of their sole assets—real property.

## IV.  DISPOSITION

The July 28, 2003, order appointing a receiver is affirmed. Plaintiffs, Charles Gold, Ruth Gold, Charles I. Gold, the Ruth Gold Family Trust, Robert L. Gold, and David G. Gold, shall recover their costs incurred on appeal jointly and severally from defendants, Richard E. Gold, Emily Gold Mears, and Jean Gold Friedman.

Grignon, J., and Mosk, J., concurred.

A petition for a rehearing was denied January 8, 2004, and respondents' petition for review by the Supreme Court was denied April 14, 2004.